Manuel PONCE et al., Plaintiffs,

v.

HOUSING AUTHORITY OF the COUNTY OF TULARE et al., Defendants.

Civ. No. S–2762.

United States District Court, E. D. California.

Jan. 16, 1975.

---

Richard M. Pearl, Charles F. Elsesser, Jr., Robert T. Olmos, Cal. Rural Legal Assistance, McFarland, Cal., for plaintiffs.

Lloyd L. Hicks, Bradley, Conn & Hicks, Visalia, Cal., for defendant HATC.

Dwayne Keyes, U. S. Atty., Richard W. Nichols, Asst. U. S. Atty., Sacramento, Cal., for defendant U. S. Secretary of Agriculture.

## MEMORANDUM AND ORDER

MacBRIDE, Chief Judge.

Plaintiffs in this action seek to have this court declare invalid and enjoin the assessment of rent increases at the Linnell Farm Labor Center and the Woodville Farm Labor Center, two housing projects operated and maintained by the Housing Authority of Tulare County on behalf of low-income, farm labor families in Tulare County.

The named plaintiffs are residents at Linnell and Woodville, and Tulare County Tenants Union is an unincorporated association of low-income tenants in Tulare County. In accordance with Federal Rules of Civil Procedure [hereafter F.R.C.P.] 23, they seek to represent a class of similarly situated plaintiffs, e. g. tenants residing in the 356 apartment units comprising Linnell and Woodville.

There are two distinct groups of defendants in this case. The "federal defendants" include the Secretary of Agriculture, the Director of the Farmers Home Administration [hereafter FmHA], and the State Director of the FmHA. The Housing Authority of Tulare County [hereafter HATC] on the other hand, is a local agency created by virtue of California law. California Health and Safety Code §§ 34200–34380 and §§ 36050–36071 (West 1973).

Jurisdiction is invoked by plaintiffs under three bases: (1) Title 28 U.S.C. § 1361 granting district courts original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to plaintiffs; (2) Title 5 U.S.C. §§ 701–704 providing for judicial review of any final agency action for which there is no other adequate remedy; and (3) Title 28 U.S.C. § 1331 conferring jurisdiction to district courts as to civil actions arising under the Constitution or laws of the United States when the matter in controversy exceeds $10,000. Plaintiffs also seek declaratory relief by virtue of Title 28 U.S.C. §§ 2201 and 2202 but those sections are not by themselves in-

dependent grants of jurisdiction. Skelly Oil Co. v. Phillips Petroleum Co., 339 U. S. 667, 70 S.Ct. 876, 94 L.Ed. 1194 (1950).

In essence, plaintiffs contend that defendants, in the process of implementing the rent increase have (1) denied plaintiffs due process of law, and (2) violated the federal and state statutes and regulations requiring that the rentals charged in projects such as Linnell and Woodville be kept as low as possible and within financial reach of low-income families. In this regard, plaintiffs seek to enjoin defendants from implementing any rent increase prior to the granting of procedural due process to plaintiffs, and a declaratory judgment that defendants' actions have violated the due process clause of the Fifth Amendment as well as various federal and state laws and regulations.

Earlier in this action, plaintiffs sought but the court did not grant either a temporary restraining order or a preliminary injunction to halt the proposed rent increase. The case is currently here on defendants' motions to dismiss or in the alternative for summary judgment, and on plaintiffs' motion for partial summary judgment on the due process claim. To fully understand the posture of this case, it is necessary to review both the law on which plaintiffs rely and on the historical development of this action.

## THE APPLICABLE LAW

(1) Farmers Home Administration [FmHA] Farm Labor Housing Loans and Grants.

Subchapter III of Title 42 U.S.C. §§ 1471–1490d, authorizes the Secretary of Agriculture [hereafter Secretary] through the FmHA to provide financial assistance for farm housing. Of particular interest to the instant case are §§ 1484 and 1486 dealing with farm labor housing.

1. In 1968 when the FmHa approved a grant for the Tulare County Housing Authority for development of units at Linnell and

Title 42 U.S.C. § 1486 provides grants for up to 90 percent [1] of the total development cost of proposed low-rent, farm labor housing:

"§ 1486. Financial assistance to provide low-rent housing for domestic farm labor—Application; considerations

(a) Upon the application of any State or political subdivision thereof, or any broad-based public or private nonprofit organization incorporated within the State, or any nonprofit organization of farmworkers incorporated within the State, the Secretary is authorized to provide financial assistance for the provision of low-rent housing and related facilities (which may be located any place within the State) for domestic farm labor, if he finds that—

(1) the housing and related facilities for which financial assistance is requested will fulfill a pressing need in the area in which such housing and facilities will be located, and there is reasonable doubt that the same can be provided without financial assistance under this section;

(2) the applicant will contribute, from its own resources or from funds borrowed under section 1484 of this title or elsewhere, at least 10 per centum of the total development cost;

(3) the types of housing and related facilities to be provided are most practical, giving due consideration to the purposes to be served thereby and the needs of the occupants thereof, and such housing and facilities shall be durable and suitable for year-around occupancy or use, unless the Secretary finds that there is no need for such year-around occupancy or use in that area; and

Woodville, § 1486 limited grants up to two-thirds of the total cost.

(4) the construction will be undertaken in an economical manner, and the housing and related facilities will not be of elaborate or extravagant design or material.

### Maximum amount of assistance

(b) The amount of any financial assistance provided under this section for low-rent housing and related facilities shall not exceed 90 per centum of the total development cost thereof, as determined by the Secretary, less such amount as the Secretary determines can be practicably obtained from other sources (including a loan under section 1484 of this title).

### Prerequisite agreements; rentals; safety and sanitation standards; priority of domestic farm labor

(c) No financial assistance for low-rent housing and related facilities shall be made available under this section unless, to any extent and for any periods required by the Secretary, the applicant agrees—

(1) that the rentals charged domestic farm labor shall not exceed such amounts as may be approved by the Secretary, giving due consideration to the income and earning capacity of the tenants, and the necessary costs of operating and maintaining such housing;

(2) that such housing shall be maintained at all times in a safe and sanitary condition in accordance with such standards as may be prescribed by State or local law, or, in the absence of such standards, in accordance with such minimum requirements as the Secretary shall prescribe; and

(3) an absolute priority will be given at all times in granting occupancy of such housing and facilities to domestic farm labor.

### Payments; contracts to specify uses of housing

(d) The Secretary may make payments pursuant to any contract for financial assistance under this section at such times and in such manner as may be specified in the contract. In each contract, the Secretary shall include such covenants, conditions, or provisions as he deems necessary to insure that the housing and related facilities, for which financial assistance is made available, be used only in conformity with the provisions of this section.

### Regulations for prevention of waste

(e) The Secretary shall prescribe regulations to insure that Federal funds expended under this section are not wasted or dissipated.

[(f) deleted]

### Definitions

(g) As used in this section—

(1) the term 'low-rent housing' means rental housing within the financial reach of families of low income consisting of (A) new structures (including household furnishings) suitable for dwelling use by domestic farm labor, and (B) existing structures (including household furnishings) which can be made suitable for dwelling use by domestic farm labor by rehabilitation, alteration, conversion, or improvement;

(2) the terms 'related facilities' and 'domestic farm labor' shall have the meaning assigned to them in section 1484(f) of this title; and

(3) the term 'development cost' shall have the meaning assigned to it in section 1845(d)(4) of this title.

As amended Dec. 31, 1970, Pub.L. 91—609, Title VIII, § 801(c), (d), 84 Stat. 1806."

Title 42 U.S.C. § 1484 permits the issuance of low-interest (one per cent)[2] loans to finance costs over and above the amount granted under § 1486:

"§ 1484. Insurance of loans for housing and related facilities for domestic farm labor—Authorization; terms and conditions

(a) The Secretary is authorized to insure and make commitments to insure loans made by lenders other than the United States to the owner of any farm or any association of farmers for the purpose of providing housing and related facilities for domestic farm labor, or to any State (or political subdivision thereof), or any broad-based public or private nonprofit organization or any nonprofit organization of farmworkers incorporated within the State for the purpose of providing housing and related facilities for domestic farm labor any place within the State where a need exists.

[(1) deleted]

(2) no such loan shall be insured if it bears interest at a rate in excess of 1 per centum per annum;

[(3) (4) (5) deleted]

[(b) (c) (d) (e) deleted]

Definitions

(f) As used in this section—

(1) the term 'housing' means (A) new structures suitable for dwelling use by domestic farm labor, and (B), existing structures which can be made suitable for dwelling use by domestic farm labor by rehabilitation, alteration, conversion, or improvements; and

(2) the term 'related facilities' means (A) new structures suitable for use as dining halls, community rooms or buildings, or infirmaries, or for other essential services facilities, (B) existing structures which

can be made suitable for the above uses by rehabilitation, alteration, conversion, or improvement and (C) land necessary for an adequate site; and

(3) the term 'domestic farm labor' means persons who receive a substantial portion (as determined by the Secretary) of their income as laborers on farms situated in the United States and either (A) are citizens of the United States or (B) reside in the United States after being legally admitted for permanent residence therein.

July 15, 1949, c. 338, Title V, § 514, as added June 30, 1961, Pub.L. 87–70, Title VIII, § 804(a), 75 Stat. 186, and amended Sept. 2, 1964, Pub.L. 88–560, Title V, § 502, 78 Stat. 796; Aug. 1, 1968, Pub.L. 90–448, Title X, § 1004, 82 Stat. 553."

This grant and loan program was specifically designed to provide low-rent housing for domestic farm laborers and their families. It is particularly noteworthy that "low rent housing" is defined as "rental housing within the financial reach of families of low income." 42 U.S.C. § 1486(g)(1). Further, it is provided that as a condition of receiving the grant, the grant applicant agrees that the Secretary shall approve rents charged, giving due consideration to the income and earning capacity of the tenants and the necessary costs of operation and maintenance of the housing project. 42 U.S.C. § 1486(c)(1).

The most recent expression of Congressional intent relating to the farm labor housing provisions identified above is the Housing and Urban Development Act of 1970, P.L. 91–609. One of the aspects of that Act was to liberalize provisions of § 1484 and § 1486 so that grant amounts could be increased and loan interest rates could be lowered. As

---

2. In 1968 when the FmHa approved a loan for the Tulare County Housing Authority for development of units at Linnell and

Woodville, § 1484 permitted a loan interest rate of 4 per cent per annum.

noted by the House Report No. 91–1556, Committee on Banking and Currency:

"The committee recognizes that financing farm labor housing is a difficult form of credit administration, particularly where the loan is to be repaid out of rental charges to the tenants. Rents must be held at low levels." U.S.Code Congressional and Administrative News, p. 5609 (1970).

(2) Farm Labor Housing Grant Policies, Procedures and Authorizations.

Pursuant to the statutory directive of Title 42 U.S.C. § 1471 et seq., the Secretary of Agriculture issued implementing regulations at 7 CFR § 1822.201–1822.-222. Of relevance to this case are the provisions of § 1822.216 dealing with the responsibilities of the grant applicant and of the State Director of the FmHA in determining rents charged to farm labor families at projects funded through § 1486 grants:

"§ 1822.216 Determining rentals.

(a) *Information.* (1) the applicant will provide the following information by making a survey of the area where the occupants of the housing will be employed:

(i) The probable earnings of the prospective domestic farm labor occupants of the housing.

(ii) The income required to enable such prospective occupants to obtain other adequate housing.

(iii) The expenditure budget required by the prospective occupants for an adequate level of living which provides for the essentials of food, clothing, health, education of children, and participation in community life.

(iv) Customary rental practices and charges for other rental housing in the area that might be available to the prospective occupants.

(2) The information furnished by the applicant will be reviewed and verified by the county supervisor with the assistance of the county committee.

(3) The information will then be included in the loan docket.

(4) Additional information as may be required by the State director to determine and approve the maximum rental to be charged domestic farm labor occupants of the housing, assisted with the LH grant, will be included or specified in instructions issued by the State office.

(b) *Approval of rental charges.* The State director, after a thorough analysis of the information required by paragraph (a) of this section, will establish and approve the maximum rentals to be charged domestic farm labor for occupancy of the housing. When making this determination he will give due consideration to the income and earning capacity of the prospective occupants of the housing and the necessary cost of operating and maintaining such housing. As a general guide, the weekly, monthly, or other rental charges usually should not exceed a rate which on an annual basis would equal 25 percent of the occupant families' estimated annual income.

(1) A memorandum stating the amount of the approved initial rental charges will be sent to the county supervisor in an original and one copy: Both the original and copy will be retained by the county supervisor and included in the grant docket. After the grant is approved, the county supervisor will send the original and copy to the applicant which will sign the original as received and noted, and return it to the county supervisor to be retained in the county office file.

(2) Rental charges may be adjusted subsequently when justified by a substantial change in the occupants' income, living costs, and other pertinent factors. The procedure will be similar to that provided in this section for establishing and approving rental charges initially."

It will be noted that the State Director of FmHA is charged with the responsibility to set maximum rentals at farm labor housing projects funded by § 1486

grants. Additionally, the State Director retains his responsibility where rental charge changes are requested.

(3) Farm Security Administration Housing.

Chapter 8 of Title 42 U.S.C. § 1401 et seq. is also claimed by plaintiffs to be relevant to this case, although the defendants dispute this contention. The Congressional intent of this chapter is declared in § 1401:

"§ 1401.  Declaration of policy

It is declared to be the policy of the United States to promote the general welfare of the Nation by employing its funds and credit, as provided in this chapter, to assist the several States and their political subdivisions to alleviate present and recurring unemployment and to remedy the unsafe and insanitary housing conditions and the acute shortage of decent, safe, and sanitary dwellings for families of low income, in urban, rural nonfarm, and Indian areas, that are injurious to the health, safety, and morals of the citizens of the Nation. In the development of low-rent housing it shall be the policy of the United States to make adequate provision for larger families and for families consisting of elderly persons. It is the policy of the United States to vest in the local public housing agencies the maximum amount of responsibility in the administration of the low-rent housing program, including responsibility for the establishment of rents and eligibility requirements (subject to the approval of the Authority), with due consideration to accomplishing the objectives of this chapter while effecting economies. It is the sense of the Congress that no person should be barred from serving on the board of directors or similar governing body of a local public housing agency because of his tenancy in a low-rent housing project.

As amended Dec. 31, 1970, Pub.L. 91–609, Title II, § 211, 84 Stat. 1779."

Section 1403 of this chapter creates within the Department of Housing and Urban Development, the United States Housing Authority. In 1950, pursuant to § 1412(f), all right, title and interest held by the federal government in and with respect to all farm labor centers held and administered by the Secretary of Agriculture for families of low income were transferred to the United States Housing Authority. It is also noted in § 1412(f) that:

". . .  the rents in such projects shall not be higher than the rents which such tenants can afford . . . ".

In addition, § 1415 outlines various procedures so that the low-rent character of housing projects may be preserved.

Section 1412(a) provides that:

"§ 1412.  Disposal of Federal projects—Purpose

(a) It is declared to be the purpose of Congress to provide for the orderly disposal of any low-rent-housing projects hereafter transferred to or acquired by the Authority through the sale or leasing of such projects as hereinafter provided; and in order to continue the relief of Nation-wide unemployment and in order to avoid waste pending such sale or lease, to provide for the completion and temporary administration of such projects by the Authority."

Pursuant to this purpose, the United States Housing Authority is authorized in § 1412(f) to sell or transfer low-rent farm labor housing projects to local housing authorities upon certification that the project is needed to house persons and families of low income with preference to low-income farmworkers.

(4) California Housing Authorities Law.

California Health and Safety Code § 34200–34218 (West 1973) provide the statutory framework for local housing authorities such as the defendant HATC. Of relevance to the instant case

are the provisions of § 34321 and § 34322, set out below:

"§ 34321. Prohibition of operation for profit; fixing rentals

It is declared to be the policy of the State that each authority shall manage and operate its housing projects in an efficient manner so as to enable it to fix the rentals for dwelling accommodations at the lowest possible rates consistent with its providing decent, safe, and sanitary dwelling accommodations, and that no housing authority shall construct or operate any such project for profit, or as a source of revenue to the city or the county. To this end an authority shall fix the rentals for dwellings in its projects at no higher rates than it finds necessary to produce revenue which, together with all other available money, income, and receipts of the authority, will be sufficient for all of the following:

(a) To pay, when due, the principal and interest on its bonds.

(b) To meet the cost of, and to provide for, maintaining and operating the projects, including the cost of any insurance, and the administrative expenses of the authority.

(c) During not less than the six years immediately succeeding its issuance of any bonds, to create a reserve sufficient to meet the largest principal and interest payments which will be due on such bonds in any one year thereafter and to maintain the reserve.

"§ 34322. Tenants; selection; qualifications

In the operation or management of housing projects an authority shall:

(a) Rent or lease the dwelling accommodations only to persons of low income and only at rentals within their financial reach.

(b)· Rent or lease to a tenant dwelling accommodations consisting of the number of rooms which it deems necessary to provide safe and sanitary accommodations to the occupants, without overcrowding.

(c) Fix income limits for occupancy and rents after taking into consideration (1) the family size, composition, age, physical handicaps, and other factors which might affect the rent-paying ability of the person, and (2) the economic factors which affect the financial stability and solvency of the project.

(d) Prohibit subletting by tenants."
See also California Health and Safety Code §§ 36050–36071 (West 1973).

## HISTORY OF THE CASE

There are currently 356 housing units in the Woodville and Linnell Farm Labor Centers combined. The first construction on both projects was undertaken by the Farm Security Administration in the 1930's. By 1937 Linnell and Woodville each had 30 three and four bedroom units, and in 1938, 48 additional two bedroom units were constructed at each site. These 156 units may be referred to as the "old units." On June 28, 1957, the federal government, pursuant to 42 U.S.C. § 1412, conveyed the old units to the HATC and released all claims of any character to the HATC.

By 1968, the remaining 200 units (the "new units") were constructed as three bedroom duplexes and quadruplexes, 100 units at each site. The total cost of these units was $1,962,000 of which $1,260,000 was a grant under 42 U.S.C. § 1486, $640,000 was a 4 per cent loan under 42 U.S.C. § 1484, and $62,000 was provided by the HATC. To obtain the grant and loan from the FmHA, the HATC on September 4, 1968, signed a resolution noting:

"Whereas the Commissioners [of HATC] in their resolution of August 20, 1965, have determined the necessity for replacement of a portion of the housing and facilities of the inadequate housing of the present Farm Labor Camps and construction of

housing and related facilities for domestic farm labor." [Exhibit H of the Complaint p. 2].

It was thereby envisioned, as detailed by subsequent sections of the September 4, 1968, resolution, that the monies received through the grant and loan would be used to finance the construction of the new units as well as to rehabilitate the old units.

Additionally, the September 4, 1968, resolution included an agreement by the HATC that in consideration of the loan and grant, the HATC would submit to the federal government for prior review and for prior approval, *inter alia*:

"(3) Proposed rents and charges and other terms of rental agreements for occupancy of the housing." [Exhibit H of the Complaint p. 13].

A thorough reading of this resolution in its entirety reveals that the HATC made its agreement in reference to all the units of the Linnell and Woodville Centers, both old and new, and that the HATC submitted itself to the rental approval authority of the federal government as to all rents charged in these centers.

In accordance with the September 4, 1968, resolution, the HATC and the FmHA entered into an agreement on November 4, 1968, wherein the HATC agreed, *inter alia*:

"1. The rentals charged domestic farm labor for the housing shall not exceed amounts which are approved in advance by the Government, giving due consideration to the income and earning capacity of such occupants and the necessary costs of operating and maintaining the housing." [Exhibit I of the Complaint p. 1].

The sole source of revenue to the Farm Labor Centers is the rent collected from tenants, which must provide for operating expenses, reserve accounts, and debt service. The rental charges in the old units were $40 (two bedroom apartments) and $45 (three and four bedroom apartments), including utilities. The rental charges in the new units were $50 per month, including garbage and water, but tenants must pay additionally for gas and electricity.

On June 28, 1972, the HATC adopted a resolution noting that there was a dire need for low income housing, that 81 per cent of farm labor families in Tulare County earned incomes below $4,000 per annum, and that over 35 per cent of the units at Woodville and Linnell were deteriorated. On this basis, an application was made to the FmHA for a grant-loan to rehabilitate Woodville and Linnell. FmHA was, however, unable to provide assistance on this request.

On November 27, 1972, experiencing financial difficulty, the HATC sent to defendant Young, the State Director for the FmHA the audit for the Farm Labor Centers and requested a waiver of the payment due December 31, 1972, on the loan. On December 18, 1972, Young responded in a brief letter stating:

"After analyzing all of the facts submitted to this office it appears that an increase in rental rates may be necessary in order to generate adequate income to properly service this account. Therefore, please inform us of your anticipated rental increases and the time schedule for implementing these increases." [Exhibit N of the Complaint p. 1].

Perceiving this to be a directive from the FmHA, the HATC at its December 20, 1972, meeting discussed a resolution seeking approval of a rent increase for the farm labor centers. On December 29, 1972, plaintiff Tenants Union wrote to defendant Young expressing concern about the tenants' ability to afford rent increases, asking for copies of the information supplied to Young by the HATC and requesting a meeting to discuss the proposed rent increase. On January 8, 1973, defendant Young responded by noting that the HATC manages the project and the FmHA was only in the position of lender, that the information supplied by the HATC could not be divulged without the express approval of

the HATC, and that a meeting to discuss the rent increase proposal should be requested from the HATC.

The HATC, at its January 31, 1973, meeting, voted to seek approval of a $10 [20%] rent increase in the new units and a $7.50 [17.5%] increase in rents in the old units. On February 13, 1973, application was made for this rent increase to the FmHa and the FmHA approved this rent increase by letter dated February 14, 1973. At the same time, on February 13, 1973, the attorney for the plaintiff Tenants Union wrote to defendant Young and requested a hearing on the necessity, legality, and amount of the rent increase. On February 21, 1973, defendant Young responded that the request for a hearing was being considered. Prior to March 1, 1973, the HATC began distributing 30-day notices to tenants concerning an April 1, 1973, rent increase.

On March 1, 1973, plaintiff Tenants Union received a response from defendant Young noting that the FmHA is not required by statute to provide a hearing as to rent increases nor was there available the necessary hearing "machinery". Defendant Young did offer, however, to afford the Tenants Union until March 15, 1973, the opportunity to submit written evidence of its position on the rent increase. The rent increase, in fact, went into effect on April 1, 1973.

## QUESTIONS PRESENTED

Based upon the above-cited law and facts, plaintiffs assert that defendants have (1) deprived them of due process of law guaranteed by the Fifth Amendment to the United States Constitution, and (2) violated federal and state statutes and federal regulations requiring that rents at farm labor centers be kept within the financial reach of low-income families.

As to the due process contention, plaintiffs allege that they are the beneficiaries of federal laws related to the farm labor housing program. Only federal defendants are accused of violating plaintiffs' due process rights in essentially three ways: (1) by failing to insure that plaintiffs actually received all information relied upon by defendant HATC in submitting the proposed rent increase; (2) by refusing to furnish plaintiffs with reasons justifying approval of the rent increase and refusing to respond specifically to plaintiffs' contentions that the rent increase was (a) outside the financial reach of low-income tenants, (b) economically unjustified, and (c) invalid under federal and state law and federal regulations; (3)· by refusing to allow plaintiffs a full and fair hearing on the matter.

Secondly, plaintiffs assert that the approval by the HATC and the federal defendants of the rent increase violates 42 U.S.C. §§ 1412(f) and 1486(g)(1), California Health and Safety Code § 34322(a), and 7 CFR § 1822.216(b) in three ways: (1) these provisions require that rents charged must be within the financial reach of the tenants; (2) defendants failed to give due consideration to what tenants can afford and what are "necessary" operating expenses of the projects; (3) defendants failed to exhaust all other possible alternatives for solving financial problems of the farm labor centers and instead have sought to place the entire burden on the tenants.

Federal defendants, joined by the HATC, have challenged the sufficiency of the complaint by a motion to dismiss under F.R.C.P. 12, or in the alternative for summary judgment pursuant to F. R.C.P. 56. The motion to dismiss attacks the complaint in three ways: (1) the federal defendants were named both individually and in their government capacities but as the complaint is devoid of any allegations of non-governmental actions on the part of these defendants, that portion of the action purporting to name the federal defendants in their individual capacities should be dismissed for failure to state a claim upon which relief can be granted. F.R.C.P. 12(b)(6); (2) the complaint is deficient in stating a jurisdictional basis for suit;

(3) the complaint has failed to state a claim upon which relief can be granted. By the last challenge defendants take issue with the legal sufficiency of plaintiffs' claim based upon due process and the federal and state statutes and regulations invoked by plaintiffs. In the alternative, defendants ask the court to grant summary judgment in their favor as to all claims, plaintiffs have also moved for a partial summary judgment as to the due process claims only.

## FEDERAL DEFENDANTS IN THEIR INDIVIDUAL CAPACITIES

█ Federal defendants are identified in the caption both in their individual and governmental capacities. A thorough reading of the complaint in a light most favorable to plaintiffs, however, fails to identify any allegation as to these defendants in their individual, non-governmental capacities. Whether proper or improper, all actions alleged to have been taken by federal defendants arise out of their governmental capacities. Accordingly, the motion to dismiss federal defendants in their individual capacities is appropriate.

## SUBJECT MATTER JURISDICTION

Plaintiffs contend that this court's jurisdiction may be founded under 28 U.S.C. § 1331, 28 U.S.C. § 1361, and 5 U.S.C. §§ 701–704. Defendants strenuously argue that jurisdiction will not lie under any of these statutes.

There exists some debate among the federal courts whether 5 U.S.C. §§ 701–704 [of the Administrative Procedure Act] grant to the district courts jurisdiction to entertain grievances as to agency action independent of any other jurisdictional ground, or whether it merely addresses the scope of review available once jurisdiction is established pursuant to another statutory grant. See CCCO-Western Region v. Fellows, 359 F.Supp. 644 (D.C.Cal.1972). As to 28 U.S.C. § 1331, the question is raised whether the rights of plaintiffs meet the jurisdictional amount in controversy. Clearly, if plaintiffs' allegations are accepted as true, the amount in controversy must include both the value of the rent increase as well as a valuation of the rights or privileges alleged to be infringed. See Cortright v. Resor, 325 F.Supp. 797 (D.C.N.Y.1971).

█ This court, however, finds that it is not necessary to address either of these issues, as jurisdiction over the federal defendants clearly exists under 28 U.S.C. § 1361, and that section does not contain a jurisdictional amount. Section 1361 grants district courts original jurisdiction as to any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff. It has been held that a district court under this section may mandate the performance of a so-called "ministerial" or non-discretionary act. Armstrong v. United States, 233 F.Supp. 188 (D.C.Cal.1964) affirmed 354 F.2d 648 (9th Cir. 1965) cert. denied 384 U.S. 946, 86 S.Ct. 1472, 16 L.Ed.2d 543. Generally, however, a district court has no power to direct or influence the exercise of discretion by an officer, employee or agency of the United States. Seebach v. Cullen, 224 F.Supp. 15 (D.C.Cal. 1963) affirmed 338 F.2d 663 (9th Cir. 1964) cert. denied 380 U.S. 972, 85 S.Ct. 1331, 14 L.Ed.2d 268. But where the exercise or failure to exercise of a discretionary act violates a constitutionally protected right, privilege, or immunity, the courts may intervene through mandamus. CCCO-Western Region v. Fellows, 359 F.Supp. 644 (D.C.Cal.1972); Mead v. Parker, 464 F.2d 1108 (9th Cir. 1972); Langevin v. Chenango Court Inc., 447 F.2d 296 (2d Cir. 1971). Jurisdiction is proper in the instant case where plaintiffs have alleged the infringement of their Fifth Amendment right to due process of law as the result of acts by officers of the federal government.

█ Furthermore, since the jurisdiction is proper as to federal defendants, the HATC is properly joined under

F.R.C.P. 19(a) as a party without whom complete relief cannot be accorded. Langevin v. Chenango Court Inc., 447 F.2d 296 (2d Cir. 1971); Paulsen v. Coachlight Apartments, G–345–72 CA (W.D.Mich.S.D. March 10, 1973). While it may be true that to a great extent the actions of the federal defendants are crucial to plaintiffs' case, it is equally true the complete relief as to the alleged deprivation of plaintiffs' constitutional rights could only be given by an order affecting all defendants in this action.

## DUE PROCESS

(1) Applicability of the Fifth Amendment.

■■ The due process clause of the Fifth Amendment applies to and restricts only the federal government and not private persons. Public Utilities Commission v. Pollak, 343 U.S. 451, 72 S.Ct. 813, 86 L.Ed. 1068 (1952). The standards utilized to find federal action for purposes of the Fifth Amendment are identical to those employed to detect state action subject to the strictures of the Fourteenth Amendment. United States v. Davis, 482 F.2d 893, 897 n. 3 (9th Cir. 1973).

■ It is often difficult to determine what is sufficient "state action", or in this case, "federal action". Evans v. Newton, 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966); Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961); Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972). In the instant case, however, the facts and circumstances disclose sufficient involvement by the federal government so that the strictures of the due process clause of the Fifth Amendment may be applicable. As to the farm labor centers in question, the federal government maintains an interest as both a grantor of funds under 42 U.S.C. § 1486 and as a lender under 42 U.S.C. § 1484. Additionally, these provisions of law, as well as the attendant federal regulations, 7 CFR §§ 1822.201–1822.222, envision direct participation by the federal government in the process of setting and raising rents. In accordance with these provisions, the HATC and the federal government through the FmHA entered into agreements which expressly provided for federal governmental approval of rents and rent increases. In fact, the HATC applied to the FmHA for permission to raise rents, that permission was granted, and without that permission, the rental increase could not have been effectuated. Therefore this court finds that the instant rent increases were the result of federal governmental action.

(2) Plaintiffs' property interest.

In deciding whether the due process clause of the Fifth Amendment applies to this case, this court must determine whether the plaintiffs have been deprived of a liberty or property interest protected by that Amendment. The Supreme Court in Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), determined that welfare benefits were a matter of statutory entitlement for persons qualified to receive them and a hearing was required before benefits could be terminated. In *Goldberg* the Supreme Court enunciated a two-step process for analyzing cases involving the deprivation of a governmental benefit: (a) it must be ascertained whether the interest at issue is a constitutionally protected "property" or "liberty" interest; (b) if the interest is a protected one, the beneficiary's interest in avoiding loss must be balanced against the government's interest in summary adjudication.

The Ninth Circuit Court of Appeals was recently faced with an analogous situation to the case at hand in Geneva Towers Tenants Organization v. Federated Mortgage Investors, 504 F.2d 483 (9th Cir. 1974). In *Geneva Towers*, tenants in two federally financed housing projects sought rescission of rent increases granted their private landlords by the Federal Housing Administration, and an injunction compelling the federal defendants to grant the tenants a full and fair hearing prior to the implementation of the rent increases. The two housing projects were financed by the

federal government pursuant to Title 12 U.S.C. § 1715l(d)(3). Under that Act Congress had determined that there were many families who had sufficiently high incomes to preclude them from eligibility for low-rent public housing but who could not afford home ownership even if assisted by conventional FHA insurance. H.Rep. No. 447, 87th Cong., 1st Sess. 11 (1961), U.S.Code Cong. & Admin.News, p. 1923. Title 12 U.S.C. § 1715l(d)(3) was designed to assist private industry in providing housing for such low and moderate income families, and in addition, persons displaced by urban renewal. The means Congress chose were the incentive of subsidized interest rates and certain tax advantages. 12 U.S.C. § 1715l(d)(5).

In *Geneva Towers* the Ninth Circuit held that (a) tenants in § 1715l(d)(3) housing have a claim to the benefits of a governmental program, namely, an expectation that they will continue to receive low cost housing; (b) tenants in § 1715l(d)(3) housing are the principal beneficiaries of the statute. Because of these factors, the Ninth Circuit determined that the tenants in *Geneva Towers* had a "property" interest cognizable under the due process clause of the Fifth Amendment.

■ Similarly, the plaintiffs in this case have an interest in not paying higher rents, which interest is in the nature of a property interest. Plaintiffs have therefore lost property as a direct result of the rental increases. Just like the tenants in *Geneva Towers,* the plaintiffs here have a claim to the benefits of a governmental program and an expectation that they will continue to receive low cost housing as farm labor families. Like the tenants in *Geneva Towers,* the plaintiffs here are the principal beneficiaries of the statutes in question.

(3) Procedural due process.

The second step of the *Goldberg* analysis requires that this court determine what form of procedural due process should be accorded to plaintiffs here, as tenants in a farm labor housing project. The Ninth Circuit in *Geneva Towers* de-

lineated three factors which must be analyzed in this regard: (a) the importance of the tenants' interest; (b) the input the tenants can make in the adjudicatory process, and (c) the governmental interest at stake.

■ The interest of the tenants in this case to procedural safeguards is substantial. They seek to retain decent housing at a price that is within their power to pay. This court can take judicial notice of the fact that farm labor families, as a class, receive substantially less income than is received by the average American family. A rise in the cost of housing could force tenants to forego necessary purchases and perhaps even necessities of life. Certainly, the tenants have an interest in insuring that any rent increase is fairly justified by all the relevant data. And as the Ninth Circuit noted in *Geneva Towers,* quoting from Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 172, 71 S.Ct. 624, 649, 95 L.Ed. 817 (1951) (Frankfurter, J. concurring), affording the tenants some participation in the rent adjustment process "generat[es] the feeling . . . that justice has been done."

The Ninth Circuit in *Geneva Towers* also addressed itself to the question of tenant input in rent determination as follows:

"As to the input tenants can make, rent determination is based in significant part upon various technical factors. . . . Tenants can contribute little to such calculations. This argues for giving the tenants less than a full-dress hearing. But it does not mean that they should be denied any role whatsoever. The FHA must also consider whether increased expenses have occurred and whether unnecessary expenses have been minimized . . . . Moreover, a rent increase hinges on . . . whether the property is being adequately maintained. . . . Obviously, tenants ·are in a good position to know the facts relative to these matters." 504 F.2d at p. 491.

In the case at hand, plaintiffs have alleged that more efficient and proper management and maintenance would reduce costs of the farm labor centers without necessitating rental increases. Plaintiffs have hired accountants to study these factors and have submitted affidavits to this court in that regard. The tenants who reside at the farm labor centers in question are in a particularly advantageous position to judge management and maintenance. It would seem, therefore, appropriate to permit at least some tenant input into the rent determination process.

The governmental interest of the federal government as grantor-lender to farm labor housing projects is two-fold: (a) to facilitate construction and maintenance of low-cost housing for farm labor families; (b) to ensure that such projects are self-sufficient so that local housing authorities can repay loan debts. Although these interests are substantial, they are certainly not inconsistent with the need to permit tenant participation in the rent determination process.

(4) Scope of the hearing.

The Ninth Circuit in *Geneva Towers* enunciated the scope of the due process hearing to which tenants are entitled in rent determinations. Commensurate with due process, the following requirements must be met: (a) the tenants must be given notice of the rent increase; (b) an opportunity must be afforded to make written objections; (c) tenants must receive a concise statement of the federal agency's reasons for its subsequent action.

These three requirements, however, cannot be read as if hewn in stone, unalterable and inflexible. The Ninth Circuit was careful to note that "the formality and procedural requisites for [a due process] hearing can vary, depending upon the importance of the interests involved and the nature of . . . subsequent proceedings." Boddie v. Connecticut, 401 U.S. 371, 378, 91 S.Ct. 780, 786, 28 L.Ed.2d 113 (1971). The scope of the due process hearing in rent determinations is a flexible one, dependent upon the facts and circumstances of the case and the relative balancing of the interests of both tenants and the government.

In *Geneva Towers*, as in the instant case, the interests of the tenants are similar. In both cases, the tenants have a substantial interest in low-rent housing and can make a substantial input into the rent determination process if afforded the opportunity. The governmental interest in summary disposition in *Geneva Towers* is also similar to the governmental interest in the instant case. In *Geneva Towers*, the government's interest:

" . . . is to preserve the flexibility of the [42 USC § 1715$l$(d)(3)] program, for if the program becomes encumbered with bureaucratic obstacles, private investment in the program may be significantly deterred." 504 F.2d at p. 491.

In the case at hand, the recipient of the federal government's grants and loans under the farm labor housing program was not a private interest, but rather a local governmental housing authority. Nevertheless, the government loans and grants made under 42 U.S.C. §§ 1484 and 1486 are available to both public and private interests. In this regard, it should also be noted that although it is the intent of California law to provide low cost housing for farm labor families, the establishment of housing authorities is not a mandatory requirement for cities and counties. California Health and Safety Code §§ 34241, 36056. If bureaucratic delays caused forfeitures of projects operated by public interests, it is unlikely that private interests will fill the breach and the result will be that farm labor housing projects may have difficulty obtaining either public or private investment.

From the foregoing it is clear that the plaintiffs in the instant case have a constitutionally protected right to a pre-termination due process hearing in accordance with *Goldberg* and *Geneva Towers*. The facts in this case must be

reviewed to determine whether plaintiffs were in fact afforded such a hearing.

(a) The impartial decision-maker.

■ At the heart of any due process hearing is the requirement of an impartial decision-maker. In re Murchison, 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942 (1955). The impartial decision-maker was an express and essential element of the *Goldberg* hearing, but was not an issue raised in the *Geneva Towers* case.

■ In the present case there are two governments involved: the federal government through the FmHA and the state government through the HATC. The defendants have argued that the HATC gave plaintiffs a hearing on the question of rent increases commensurate with the requirements of due process. However, the issue of the sufficiency of the "hearing" afforded plaintiffs by the HATC need not be reached as this court is of the opinion that the federal government, through the FmHA [the agent of the Secretary of Agriculture], as the final decision-maker, is charged with the responsibility to provide a due process hearing.

A thorough reading of the applicable federal and state statutes and the federal regulations leads to the conclusion that it is the FmHA which has final authority to approve rent increases at farm labor housing projects funded through federal monies. As outlined earlier in this memorandum, 7 CFR § 1882.216(a) provides that the applicant [in this case the HATC] shall submit information to the State Director of the FmHA relating to rental charges; 7 CFR § 1822.216(b) notes that the State Director will establish and approve maximum rentals. This is in accord with 42 U.S.C. § 1486 which provides that applicants for federal financial assistance [such as the HATC must agree that the rentals charged domestic farm labor shall not exceed such amounts as may be approved by the Secretary of Agriculture. Such an agreement, it was noted earlier in this memorandum, was expressly made between the FmHA and the HATC. Finally, state law is in complete

accord as noted in California Health and Safety Code § 36057 dealing with general powers of housing authorities relating to farm labor centers:

"It is the purpose and intent of this part to do any and all things necessary and desirable to secure the financial aid or co-operation of the federal government in the undertaking, construction, maintenance, operation, or financing of any farm labor center."

■ Since final approval of rent increases in farm labor projects funded through 42 U.S.C. §§ 1484, 1486 rests with the Secretary of Agriculture [through the FmHA], it was incumbent upon the FmHA to afford the plaintiffs their due process hearing. The purpose of a due process hearing is to safeguard from deprivation the liberty or property rights of the protected persons, and this can only be done where the requisite hearing is held before the decision-maker so that the decision-maker can sift through the facts, weigh the evidence, and reach the appropriate conclusion. Although the HATC, as the operator of the project and applicant for the rent increase, may and should conduct a hearing prior to requesting a rental increase, it is the federal government and its agencies, as final decision-maker, which must give to plaintiffs their due process hearing.

(b) Notice.

In an affidavit filed with this court on April 11, 1973, defendant Young, State Director of FmHA, stated that he had delegated responsibility for "administrative handling of the Labor Housing Loan account of the Housing Authority of Tulare County to Mr. James C. Rathbone, who is a member of my staff with the title of Chief of Rural Housing." Mr. Rathbone, also by affidavit dated April 11, 1973, noted that the HATC application for proposed rent increases was submitted to the FmHA by letter dated February 13, 1973, and that the FmHA "promptly approved them by letter dated February 14, 1973."

■ The reasonableness of the notice is not in question here because

the FmHA simply did not give the tenants involved notice of *any* kind prior to the approval of rent increases. While tenants may have had notice through other sources that the HATC was deliberating on the question of a rent increase, or that the question of rent increases would be ultimately referred to the FmHA, this is not the issue here. Once the FmHA received the application for proposed rental increases on February 13, 1973, the FmHA should have given tenants in the affected housing projects notice that: (1) the application had been received; (2) a summation of the contents of the application; (3) tenants or their representatives could view the application in its entirety and procedures to be followed for such viewing; (4) tenants could submit written comments or objections thereto, and a reasonable time and procedure for the making of such comments or objections; (5) the FmHA would consider all documents, comments or objections submitted; and (6) the FmHA would issue a concise statement of its decision following deliberation. No notice of any kind was afforded tenants in this case by the FmHA and a decision was rendered on February 14, 1973, simply approving the application out-of-hand, without any input by the tenants involved. This lack of notice violates the plaintiffs' due process rights at the threshold.

(c) Opportunity to present written response.

As noted, the application for rent increases was dated February 13, 1973, and was approved by the FmHA on February 14, 1973.[3] Prior to March 1, 1973, the HATC, armed with this approval, began distributing 30-day notices to tenants concerning an April 1, 1973, rent increase. On February 13, 1973, the attorney for plaintiff Tenants Union wrote to defendant Young requesting a hearing on the necessity, legality and amount of a rent increase. On March 1, 1973, defendant Young responded by noting that the FmHA would give the

Tenants Union until March 15, 1973, to submit written evidence of its position on the rent increase. This letter also noted that the FmHA was not required to give the Tenants Union a hearing, nor did it have the "machinery" to do so.

This "opportunity" afforded the plaintiffs in this case is deficient in at least three aspects: (1) a decision to approve the rent increase had already been made by the FmHA at least as early as February 14, 1973; in light of the tone of the letter and the fact that notices to raise the rent were circulating among the tenants, the Tenants Union could rightfully feel that to submit any written evidence at this late date would be an empty and futile exercise; (2) it cannot be said that a period of approximately two weeks would be sufficient time for the Tenants Union to adequately frame its response and submit supporting documents; (3) while the Tenants Union may represent some or even most of the tenants in the housing project, each and every tenant family at Linnell and Woodville should have been given the same reasonable opportunity to respond in writing.

One final word should be said concerning the FmHA's assertion that it does not possess the "machinery" necessary to afford tenants a due process hearing. It has already been determined that a full-dress hearing, complete with presentation of evidence and examination and cross-examination of witnesses, is not a necessity in the rental determination process. The only "machinery" necessary to afford the tenants and plaintiffs in this case the type of due process hearing to which they are entitled, is to provide an impartial decision-maker, notice, a review of written evidence, and the furnishing of a concise statement of reasons. This is certainly not an onerous burden on the FmHA, but it is a necessary concomitant to its duty of approving or disapproving rental increases.

3. Arguably, the FmHa had already "approved" a rental increase as a result of its December 18, 1972, letter from defendant Young to the HATC wherein it was noted that a rent increase was necessary.

(d) Concise statement of reasons.

At no time did the FmHA afford the tenants at the housing projects here a concise statement of reasons for its determination to approve the rent increase. Defendants have presented to this court a letter dated March 26, 1973, from the FmHA in response to a congressional inquiry by Representative Jerome R. Waldie, as the equivalent of the "concise statement" required by *Goldberg* and *Geneva Towers.*

█ It is, however, the *tenants* who are entitled to the statement of reasons in the first instance. The tenants should not have to implore their Congressman to elicit from the FmHA the simple dignity of a statement of reasons for the approval of a rent increase directly affecting them. As a integral segment of the determination process, the decision-maker should state the reasons for its determination and indicate the evidence relied upon. Goldberg v. Kelly, 397 U.S. 254, 271, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). And this statement should be supplied directly to and for the benefit of the persons directly affected by the decision.

(e) Availability of documentary evidence.

Plaintiffs requested that the federal defendants make available to them the documents relied upon by the HATC in support of the proposal for rent increases and submitted therewith to the FmHA. Initially it should be noted that nearly all records and documents of the HATC are considered public records open for inspection according to California law. California Health and Safety Code § 34332(c). See also California Government Code § 6250 et seq. The federal defendants do not contest this point, but rather contend that the Freedom of Information Act, 5 U.S.C. § 552(b)(4), and the FmHA regulations, 7 CFR § 1813.5(b), bar disclosure of this information.

Title 5 U.S.C. § 552(b)(4) notes that the following information need not be disclosed for public information:

" . . . trade secrets and commercial or financial information obtained from a person and privileged or confidential."

Title 7 CFR § 1318.5 lists the records of the FmHA which are not available to the public and includes:

"(iv) Commercial or financial information obtained from any party which is privileged or confidential. Among FHA records in this class are those which consist of or involve information submitted or obtained in connection with an application for a loan or grant frm FHA, advances under such a loan or grant, or the fulfillment of obligations under the loan or security instruments or grant agreements relating to such loan or grant. Examples of these FHA records are loan or grant applications, with supporting data, and records that discuss or utilize them; amount of borrower's outstanding FHA indebtedness; records which set forth or relate to specific applicants' or borrowers' operating requirements, such as farm and home plans and proposed operating plans and budgets; borrowers' promissory notes or bonds; borrowers' loan or grant resolutions or agreements; borrowers' bylaws and minutes of meetings; and reports in running records of inspection or investigation of borrowers' operations."

█ While these provisions of law and regulation most certainly bar access to financial records of private persons and organizations, there is no reason to believe that the scope of the exemption ought to be extended to encompass the HATC, a governmental entity itself subject to the disclosure requirements of California law. This is not to say, however, that the FmHA may disclose any and all records and documents submitted which deal with the financial information of individual, named tenants.[4] But

---

4. While such records and documents dealing with named, private individuals' financial information are clearly exempted from the scope of the Freedom of Information Act,

generally, the records and documents of a public entity such as the HATC are matters of public record and plaintiffs should have access thereto. City of Concord v. Ambrose, 333 F.Supp. 958 (D.C. Cal.1971).

This requirement of disclosure is especially relevant where citizens, as plaintiffs here, seek to gain access to records and documents within the scope of a procedural due process hearing. As noted by Greene v. McElroy, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959):

> "Certain principles have remained relatively immutable in our jurisprudence. One of these is that where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue. . . . [t]his is important in the case of documentary evidence . . . ." 360 U.S. at 496, 79 S.Ct. at 1413.

In the instant case, the plaintiffs would have great difficulty presenting their case and the FmHA would therefore be unaided by the evidence of the tenants, if access is denied to the records and documents submitted by HATC as part of its application. Such a denial would not only be contrary to due process, but would not be within the spirit and the letter of the Freedom of Information Act.

### RENT INCREASES AS VIOLATIONS OF FEDERAL AND STATE STATUTES AND REGULATIONS

Plaintiffs have also asserted that the approval by the HATC and the federal defendants of the rent increases violates 42 U.S.C. §§ 1412(f) and 1486(g)(1), California Health and Safety Code § 34322(a), and 7 CFR § 1822.216(b). Since this court has already determined that the plaintiffs' due process rights were violated in the determination and approval of the rent increases, and that a new due process hearing is required, it is not necessary to squarely reach the other questions presented.

The applicability and interpretation of the above-noted statutes is a question within the primary jurisdiction of the Secretary of Agriculture and should come to this court only on appeal from his decision. The necessity of a rent increase is a question which should be presented through the HATC for the approval by the FmHA, as agent for the Secretary of Agriculture, after the appropriate due process requirements hereinabove enunciated have been met. It is sufficient at this juncture only to note that rent increases are not *per se* invalid at farm labor centers, and rent increases are contemplated by the federal and state statutes and regulatory provisions. The FmHA is, however, admonished to pay heed to the factors which the statutes and regulations charge it with considering *prior* to approval of a rent increase, but *after* all the evidence has been presented, including the income and earning capacity of the tenants and the necessary costs of operating and maintaining the housing project.

### CLASS ACTION

Although either plaintiffs or defendants may move for a determination of appropriateness of a class action pursuant to F.R.C.P. 23(c)(1), Cook County Teachers Union v. Byrd, 456 F.2d 882 (7th Cir. 1972), cert. denied 409 U.S. 848, 93 S.Ct. 56, 34 L.Ed. 2d 90, neither have done so. Plaintiffs in their complaint have, however, prayed this court to grant them leave to proceed as a class action. This court has an independent obligation to decide the issue and need not wait for the parties to so move. Frankel, "Some Preliminary Observations Concerning Civil Rule 23," 43 F.R.D. 39 (1967); Stebbins v. Nation-

---

summaries or compilations of such information, presented statistically and without

naming or identifying the individuals involved, would be matters of public record.

wide Mutual Insurance Co., 469 F.2d 268 (4th Cir. 1972), cert. denied 410 U.S. 939, 93 S.Ct. 1403, 35 L.Ed.2d 606.

F.R.C.P. 23(a) creates four prerequisites to the maintenance of a class action:

"One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class."

In addition to satisfying all the elements set out in Rule 23(a), the case must fall within one of the three categories of class actions described in Rule 23(b):

"An action may be mtaintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition: (1) the prosecution of separate actions by or against individual members of the class would create a risk of (A) inconsistent or varying adjudications . . ., or (B) adjudications with respect to individual members of the class which would as a practical matter be dispositive . . . ; or (2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or (3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods [of] adjudication. . . . ."

▇▇▇ This court finds that this is a proper class action. The proposed class consists of all tenants of Linnell and Woodville who were and are subject to the rental increases. Since Linnell and Woodville have 356 apartment units and since this group of tenants is consistently subject to changes, this court finds that requirement 23(a)(1) is met and that joinder is impracticable in this case. Requirement 23(a)(2) is also satisfied since the question of the due process of the rental increase procedure is common to all of the tenants.

Furthermore, it is clear that the due process claim of the representative parties is in substance typical of the claims of the class in accordance with 23(a)(3). Even though each tenant's financial position is different from every other tenant's, the allegation that the rental increase procedure denies due process is a claim typical to all of the tenants. As noted by the Court of Appeals for the Second Circuit in Eisen v. Carlisle & Jacquelin, 391 F.2d 555 (2d Cir. 1968):

"Furthermore, plaintiffs' claim is 'typical of the claims . . . of the class.' . . . Although there are varying fact patterns underlying each individual odd-lot transaction, the same allegedly unlawful differential is charged to all buyers and sellers." 391 F.2d at 562.

In the instant case, although the plaintiffs find themselves in varying factual circumstances in accordance with their relative incomes and expenditures, they all have been subjected to the results of the same unlawful procedure.

Additionally, this court finds that requirement 23(a)(4) is also met. Plaintiffs are represented by well-qualified attorneys, so the quality of representation is not in question. If some members of the class believe that their interests are not adequately protected, they may so inform this court. It is difficult, however, to perceive how this action could prejudice any party's interests since no one has a legally protectable interest in the continuation of an unconstitutional procedure.

In addition to meeting the prerequisites of Rule 23(a), this court finds that the class action meets the requirements

of Rule 23(b)(2), as the relief sought against the defendants would be appropriate to the class as a whole and the defendants have acted on grounds generally applicable to the class.

Having found that this is a valid class action, this court also finds it essential that all members of the class be notified. Plaintiff Tenants Union is an appropriate party to facilitate notification of this action and its disposition to the members of the class. Accordingly, plaintiff Tenants Union, within 45 days following receipt of this memorandum and order, shall notify by first class mail or personal service, each tenant at Linnell and Woodville, and each former tenant subjected to the rental increase, of the disposition of this action. Notification of the head of household in each family shall be considered sufficient notification of each member of that family. Costs of this notification shall be considered as if they were costs of suit.

## REMEDY

█ Although this court has determined that the federal defendants failed to afford the plaintiffs here the due process hearing to which they were entitled, the question still remains what should be done with the amounts of increased rentals collected by the HATC since April 1, 1973. In this regard, this court concurs with the district courts in Paulsen v. Coachlight Apartments Co., G–345–72–C.A. (W.D.Mich. March 10, 1973); Keller v. Kate Maremount Foundation, 365 F.Supp. 798 (N.D.Cal.1972, affirmed 504 F.2d 483 (9th Cir. 1974), that an immediate refund of the amounts of increased rental collected is neither necessary nor desirable. Such an immediate refund of excess rental collected since April 1, 1973, would entail a substantial amount of money and may have a significant effect on the housing projects. Neither the HATC, the Linnell and Woodville centers, nor the tenants here should suffer because of the federal defendants' failure to afford them a due process hearing. Therefore, the order must be carefully drawn so as to preserve the tenants' due process rights while protecting their interests in a financially secure housing project.

## ORDER

It is hereby ordered, that

1. This is a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and the views expressed in this memorandum; plaintiff Tenants Union will give notice in accordance with the procedures outlined in this memorandum;

2. Defendants' motion to dismiss the federal defendants in their invidual capacities is GRANTED; defendants' motion to dismiss for lack of subject matter jurisdiction is DENIED; defendants' motion to dismiss for failure to state a claim or in the alternative for summary judgment is DENIED;

3. Plaintiff's motion for partial summary judgment as to the due process claim is GRANTED, and the case is remanded to the Secretary of Agriculture for proceedings consistent with this memorandum; in this regard, the following actions and procedures are ordered:

(a) that HATC shall immediately set up an escrow account and deposit therein funds or notes to equal the rental charges collected from Linnell and Woodville tenants since April 1, 1973, which equal the amount of rental increases imposed since that date;

(b) tenants at Linnell and Woodville shall continue to pay the present rental rates to the HATC except that all funds equal to the post-April 1, 1973, rent increase shall be deposited by the HATC into the escrow account;

(c) FmHA shall forthwith conduct a hearing on the application for rent increases consistent with the views expressed in this memorandum on the question of rent increases retroactive to April 1, 1973; this hearing shall consider whether the amount of the rent increase proposed in the application was necessary under the conditions and circumstances as they existed on April 1, 1973;

(d) should FmHA approve the application for rent increases, the monies held in the escrow account shall be returned to the HATC, but not until 30 days following such approval;

(e) should FmHA deny the application for rent increases in whole or in part, the HATC shall pay each tenant or former tenant from the escrow account, the amount of disapproved rental increase paid by such tenant or former tenant since April 1, 1973, but not until 30 days following such denial;

4. All parties to bear their own costs of suit and attorney's fees.