Velma LIFGREN, Ruby Peterson, Florence Anderson, Dennis Erickson, Marie Erickson, Philip Schaffner, Clem Ostertag, Florence Peterson, Esther Helps, Clara Ecklund, Herma Blair, Grace Peterson, Lillian Magnuson, Jeanette Johnson, Esther Faust, Evelyn Pruszka, Ivy Vitous, Colette Ledin, Clinton Ledin, Lillian Bathhurst, and Paul Bathhurst, Plaintiffs,

v.

Clayton YEUTTER, in his official capacity as the United States Secretary of Agriculture; Neal Sox Johnson, in his official capacity as acting Administrator of the Farmers Home Administration; Russ Bjorhus, in his official capacity as Minnesota State Director of the Farmers Home Administration; and William H. Slininger, in his official capacity as District Director for the Farmers Home Administration; Paddington Investors, a Minnesota Partnership, Defendants.

Civ. No. 4–89–912.

United States District Court,
D. Minnesota,
Fourth Division.

June 27, 1991.

---

Timothy L. Thompson, Mid–Minnesota Legal Assistance, Inc., Minneapolis, Minn., and Virginia Stark, Cambridge, Minn., for plaintiffs.

Stuart M. Gerson, Asst. Atty. Gen., Jerome G. Arnold, U.S. Atty., Mary Jo Madigan, Asst. U.S. Atty., Arthur R. Goldberg and Carlotta P. Wells, Attys., Dept. of Justice, Civ. Div., Washington, D.C., for federal defendants.

Roy W. Holsten, Holsten & Schumann, P.A., Stillwater, Minn., for defendant Paddington Investors.

## ORDER

DOTY, District Judge.

This matter is before the court on plaintiffs' motion for summary judgment against the United States Secretary of Agriculture, the Acting Administrator of the Farmers Home Administration, the

Minnesota State Director of the Farmers Home Administration, the District Director for the Farmers Home Administration (the "Federal Defendants") and Paddington Investors ("Paddington"). Also before the court is Paddington's motions to dismiss plaintiffs' complaint and for summary judgment against the Federal Defendants. Finally, the court will consider the Federal Defendants' motions to dismiss plaintiffs' complaint and for summary judgment against Paddington.

For the reasons stated herein, plaintiffs' motion will be granted in part and denied in part, Paddington's motion to dismiss will be denied, Paddington's motion for summary judgment will be granted in part and denied in part, the Federal Defendants' motion to dismiss will be denied, and the Federal Defendants' motion for summary judgment will be granted in part and denied in part.

## FACTUAL BACKGROUND

Plaintiffs are low income elderly or handicapped residents of Heather Creek Apartments ("Heather Creek"). Heather Creek is a rental project financed by the Farmers Home Administration ("FmHA") under Section 515 of the Housing Act of 1949. Heather Creek is also subsidized by the Department of Housing and Urban Development ("HUD") under Section 8 of the Housing Act of 1937. Defendant Paddington is the owner of Heather Creek and built the project with funds it borrowed from FmHA. The present lawsuit resulted from Paddington's attempt to prepay the FmHA mortgage on Heather Creek. In order to understand the facts of this case, it is first necessary to summarize the statutory and regulatory framework which surrounds the funding of projects such as Heather Creek.

### A. Statutory and Regulatory Background

FmHA financed Heather Creek under Section 515 of the Housing Act of 1949, 42 U.S.C. § 1485, which is commonly known as the "Rural Rental Housing Program". Congress enacted Section 515 of the Rural Rental Housing Program in an effort to resolve the housing shortage for the elderly and others on low incomes in rural areas. Under Section 515 the FmHA[1] is authorized to extend loans to nonprofit organizations for the purpose of developing rural renting housing for the elderly. Over the years, Congress has expanded Section 515 to cover housing and related facilities for elderly persons and families or other persons and families of low income. *See id.*

Under Section 515 of the Rural Rental Housing Program, the FmHA is authorized to issue loans at market rates to developers and owners of Rural Rental Housing for the elderly and persons with low incomes. Because the elderly and persons with low incomes cannot normally afford the rents which owners of such projects would charge, Congress enacted a number of subsidy programs designed to work in conjunction with Section 515 loans. One of the programs Congress has enacted is the Section 8 Housing Assistance Program which is administered by HUD and codified at 42 U.S.C. § 1437f. Under Section 8, owners of projects funded with Section 515 loans enter into housing assistance payment contracts with the government which provide that low income tenants pay up to 30% of their income for rent. The government then pays the difference between the amount of rent the low income tenant pays and the fair market rental value of the rental unit.

The idea behind Section 515 loans and the Section 8 subsidy program was that elderly and other low income individuals would have a secure supply of affordable housing during the term of the FmHA mortgage.[2] The supply of housing for low

---

1. 42 U.S.C. § 1471(a) provides in pertinent part that "[t]he Secretary of Agriculture (hereinafter referred to as the 'Secretary') is authorized, subject to the terms and conditions of this subchapter, to extend financial assistance, through the Farmers Home Administration...."

2. As will be seen below, the term of Section 8 subsidies are not necessarily concurrent with the terms of Section 515 loans. Notwithstanding the different time tables that govern the application of the two programs, however, it is clear that Congress' intent in acting the pro-

income individuals was not absolutely secure, however, because the developers of projects financed by Section 515 loans could pay the entire outstanding balance of the loan prior to the maturity date of the mortgage. Such prepayment by the developers of Section 515 projects had the effect of displacing the low income tenants that had occupied the units prior to prepayment. That displacement frustrated the congressional intent embodied in the Rural Rental Housing Program. See H.R.Rep. No. 154, 96th Cong., 1st Sess. 43, *reprinted in* 1979 U.S.Code Cong. & Admin.News 2317, 2359. In response to developers prepaying their Section 515 loans and the displacement of low income tenants that followed thereon, Congress enacted the Emergency Low Income Housing Preservation Act of 1987 ("the Preservation Act"). Pub.L. No. 100–242, 101 Stat. 1815–1886 (1988) (codified at 42 U.S.C. § 1472(c) (1988)). Section 515 loans were usually made for a term of 40 or 50 years. Prior to the enactment of the Preservation Act, borrowers of Section 515 loans which were approved prior to December 21, 1979, ("pre–1979 loans") had the option of prepaying their mortgages at any time and removing their project from the program without restrictions. Through the Preservation Act, Congress placed certain restrictions on prepayment of Section 515 loans which were used to fund pre–1979 projects.

Under the Preservation Act, an owner of a project funded by a pre–1979 Section 515 loan who wishes to prepay his outstanding indebtedness must submit a request to prepay to the FmHA. Before 30 days pass, the FmHA must notify each tenant of the housing unit as well as interested nonprofit organizations and appropriate state and local agencies that the owner of the project has submitted a request to prepay the Section 515 loan. 42 U.S.C. § 1472(c)(3). The FmHA is not allowed to accept prepayment offers until it complies with certain steps specified in the Preservation Act. First,

the FmHA must attempt to enter into an agreement under which the owner of the project commits to extend the low income use of the project for 20 years from the date of such agreement. 42 U.S.C. § 1472(c)(4)(A). Because the Preservation Act aims at extending the low income use of Section 515 projects, the FmHA is authorized to offer various financial incentives to owners who have indicated a desire to prepay Section 515 loans. Specifically, the Preservation Act authorizes the FmHA to offer owners the following incentives: [3] (1) increasing the rate of return on the investment; (2) reducing the interest rate on the loan; (3) providing additional rental assistance; (4) providing an equity loan; and (5) in connection with clauses (2) and (4), providing incremental rental assistance to prevent an increase in rents to tenants who are not already receiving rental assistance. 42 U.S.C. § 1472(c)(4)(B). If, despite the incentives the FmHA has offered to the owner, the owner will not enter into an agreement to extend the low income use of the project, then the FmHA must require the owner to offer to sell the project to a qualified nonprofit organization or public agency at fair market value. 42 U.S.C. § 1472(c)(5)(A). Once the project is offered for sale to a qualified nonprofit organization or public agency, if 180 days passes without a bona fide offer of purchase being submitted, then the FmHA may accept the owner's prepayment request. 42 U.S.C. § 1472(c)(5)(A)(ii).

Under the Preservation Act the FmHA must follow the steps delineated above before it may accept an owner's prepayment request. The only exceptions to the Preservation Act's requirements outlined above apply after the FmHA has attempted to secure the owner's participation in an agreement that will extend the low income use of the project. Specifically, if the project owner refuses to enter a 20 year agreement even after the FmHA offers

___

grams was to secure housing for elderly and low income individuals.

**3.** The Preservation Act authorizes the FmHA to offer owners "1 or more of the following forms of assistance that the Secretary, after taking into

account local market conditions, determines to be necessary to extend the low income use of the housing and related facilities involved." 42 U.S.C. § 1472(c)(4)(B).

him or her the financial incentives delineated in 42 U.S.C. § 1472(c)(4)(B), then the FmHA must require the owner to offer to sell the project to a qualified nonprofit organization or a public agency *unless* one of two exceptions to that requirement applies. There are two situations in which the FmHA does not have to require the project owner to offer the project for sale to a qualified nonprofit organization or public agency. First, the owner can enter into an agreement with the FmHA under which the owner is obligated to use the housing for low or moderate income individuals for 20 years from the date of the execution of the mortgage agreement and then the owner must sell the property to a qualified nonprofit organization or public agency at the expiration of that 20 year period. 42 U.S.C. § 1472(c)(5)(G)(i)(I)–(II). Second, if the FmHA determines that the prepayment will not materially affect the housing opportunities of minorities, then if either the owner agrees to insure that tenants in the project will not be displaced due to the change in the use of the project or an increase in rents, or, if the FmHA determines that safe, decent and affordable rental housing exists within the area of the Section 515 project and steps have been taken to ensure that such housing will be made available to each tenant upon displacement, then the second exception applies. 42 U.S.C. § 1472(c)(5)(G)(ii)(I)–(II). If either the first or second exception applies, then the FmHA need not require the owner to offer the project for sale to a qualified nonprofit organization or public agency. These exceptions come into play, however, only after the FmHA has attempted to negotiate an agreement with the owner, using financial incentives, which extends the low income use of the project for 20 years.

On its face, the Preservation Act is fairly straight forward. Confusion arose, however, when the FmHA began designing regulations pursuant to the Preservation Act. The FmHA first promulgated Preservation Act regulations on April 22, 1988, which were codified at 7 C.F.R. § 1965.90 (1989) ("the 1988 Regulations"). Under the 1988 Regulations, when an owner of a

project financed by a pre–1979 Section 515 loan indicated a desire to prepay the loan, the local FmHA district office would engage in the process outlined in 7 C.F.R. § 1965.90 (1989). Specifically, the FmHA district office: (1) sent the notice of intent to prepay to the tenants of the project and appropriate nonprofit organizations and public agencies; (2) sent an acknowledgement letter to the borrower of the pre–1979 Section 515 loan; (3) after reviewing local market conditions and any comments received from the tenants of the projects, the FmHA district office determined whether a need for the housing provided by the project existed; (4) accepted prepayment if one of the two exceptions outlined in 42 U.S.C. § 1472(c)(5)(G) applied; and (5) executed the appropriate satisfaction of the mortgage, depending on which 42 U.S.C. § 1472(c)(5)(G) exception the borrower of the pre–1979 Section 515 loan agreed to. *See* 7 C.F.R. § 1965.90 (1989). If the FmHA did not accept the attempted prepayment of the pre–1979 Section 515 loan, then the borrower could appeal the determination within the FmHA. If the borrower's appeal was successful, then the FmHA would accept prepayment. If the borrower's appeal was unsuccessful, however, or if the borrower requested economic incentives, then the FmHA would attempt to convince the borrower to enter into an agreement to extend the low income use of the project by offering the borrower the economic incentives outlined in 42 U.S.C. § 1472(c)(4)(B). If the borrower rejected the incentive offer, then, and only then, would the borrower be required to offer the housing for sale to a qualified nonprofit organization or public agency.

The 1988 Regulations generated substantial criticism and provided the impetus for the initiation of several lawsuits including the instant litigation. The difficulty with the 1988 Regulations was that they did not properly track the prepayment procedures for pre–1979 Section 515 loans as required by the Preservation Act. Under the Preservation Act the first substantive action the FmHA is to take after receiving a prepayment request, is to attempt to con-

vince the borrower to enter into an agreement, using financial incentives if necessary, to extend the low income use of the project for 20 years. If the owner will not enter into such an agreement, then the property is required to be offered for sale to a qualified nonprofit organization or public agency, unless one of the exceptions outlined in 42 U.S.C. § 1472(c)(5)(G) applies. Only after engaging in those steps could the FmHA accept prepayment. Under the 1988 Regulations, on the other hand, the first substantive step in which the FmHA engaged was to determine if one of the two exceptions to offering the property for sale to a qualified nonprofit organization or public agency applied. If the FmHA determined that one of the two exceptions applied then prepayment would be accepted immediately. The FmHA attempted to get the owner to extend the low income use of the project only if it determined that the exceptions did not apply and after the owner lost on appeal within the FmHA or requested economic incentives.

In response to criticism of the 1988 Regulations and the initiation of lawsuits challenging those regulations, the FmHA issued amended Preservation Act Regulations on February 13, 1990, which are codified at 7 C.F.R. § 1965.90 (1991). ("the 1990 Regulations"). Under the 1990 Regulations, when the FmHA receives a prepayment request, it first determines the need for low income housing, then offers financial incentives to the borrower of the pre-1979 Section 515 loan in an attempt to extend the low income use of the project and to discourage prepayment. The goal, consistent with the Preservation Act, is to get the borrower to enter into an agreement extending the low income use of the project. If the borrower refuses to enter into such an agreement, however, then the FmHA determines if one of the two exceptions outlined in 42 U.S.C. § 1472(c)(5)(G) applies. If one of the two exceptions applies, then prepayment is accepted. If neither of the exceptions apply, then the FmHA requires the borrower to offer the project for sale to a qualified nonprofit organization or public agency for a period of 180 days. If no bona fide offer is received within the 180 days, then the FmHA will accept prepayment. *See* 7 C.F.R. § 1965.90 (1991).

A review of the Preservation Act and the 1990 Regulations reveals that the 1990 Regulations track the language of the Preservation Act more closely than do the 1988 Regulations. Consequently, it can be stated with some certainty that the 1990 Regulations more adequately effectuate the intent of Congress reflected in the Preservation Act. Although the differences between the 1988 Regulations and the 1990 Regulations may seem minor at first glance, they take on major significance when applied to the facts of this case.

### B. *The Paddington Project*

On August 24, 1977, Paddington entered into a Section 515 loan agreement with the FmHA. On October 31, 1977, Paddington executed a promissory note secured by a mortgage, which FmHA held. The funds from the Section 515 loan were to be used for the construction of, and the mortgage held by FmHA was on, the Heather Creek Apartments. Paddington used the Section 515 loan to build Heather Creek and, pursuant to the terms of the loan agreement, Paddington rented the housing to low and moderate income tenants. The promissory note which Paddington executed with respect to the property was payable over a term of 40 years. Notwithstanding the 40 year term, however, the note specifically provided that "[p]repayments of scheduled installments, or any portion thereof, may be made at any time at the option of the Borrower." The note also provided that it "shall be subject to the present regulations of the Farmers Home Administration and to its future regulations not inconsistent with the express provisions hereof."

In addition to the securing the Section 515 loan from the FmHA, Paddington also entered into a Housing Assistance Payments contract with HUD. Under the terms of the contract, HUD agreed to provide Paddington with a Section 8 rent subsidy in connection with Heather Creek. In effect, the HUD contract provided that

HUD would pay Paddington the difference between the rents that the low and moderate income tenants of Heather Creek would pay and the fair market value of rents in what HUD determined to be the relevant area. The HUD contract covered an initial five-year term and provided an option of three additional five-year terms. Because the contract was entered into on July 31, 1978, if Paddington decided to exercise the option of renewing the contract for its full potential duration, the contract would be in effect until July 31, 1998.

In the spring of 1988, Paddington notified the FmHA district office of its desire to prepay its Section 515 mortgage on Heather Creek. In response to this notification, the FmHA District Director sent Paddington a copy of the 1988 Regulations. The District Director informed Paddington that it would have to comply with the 1988 Regulations in submitting its prepayment application. On July 5, 1988, Paddington submitted its formal prepayment request to the FmHA district office. In its prepayment request, Paddington stated that it would maintain the HUD contract relating to the Section 8 subsidy until 1998 and thus limit the possibility that the moderate and low income tenants of Heather Creek would be displaced prior to that date. Paddington further indicated that rents at Heather Creek would not be increased as a result of its prepayment of its Section 515 loan and stated that the project would continue to be administered in accordance with Fair Housing policies. On July 8, 1988, the FmHA District Director mailed an acknowledgment letter to Paddington and sent Paddington's prepayment request to the FmHA State Director. In addition to forwarding the prepayment request, the FmHA District Director also sent a report on prepayment to the FmHA State Director.

The FmHA District Director also sent by certified mail a notice of Paddington's intent to prepay its Section 515 loan to each tenant of Heather Creek. That notice provided in pertinent part:

The owners of Heather Creek Apartments have requested to pay their FmHA loan in full and remove the housing from the FmHA program. However, the owners intend to continue to provide a HUD Section 8 Subsidy. It is anticipated that rents will not change due to the payment of the loan to FmHA. Under no circumstances will prepayment be accepted before August 8, 1988.

You may apply for a letter of priority entitlement to be placed on the waiting list of any FmHA-financed project for which you qualify in the nation. You will have up to the date your lease expires, the date of this letter or the date of prepayment, whichever occurs last, to apply for this letter and it will be valid for 60 days after issue.

If you choose to remain in your present apartment after the loan is prepaid you may not be evicted without good cause.

Other FmHA projects in Chisago County are noted on the attached list.

. . . .

The payment will [sic] accepted because it is determined that there will be *NO* change in rental rates or other charges as a result of prepayment for a period of 20 years from the date of the original loan (Oct. 31, 1977).

All tenants currently in residence have 30 days from the date of this letter to present evidence contrary to the basis for this determination.

In accordance with Title V of the Housing Act of 1949, as amended, tenants as well as the government may seek enforcement under the provisions under which an FmHA Multi-family housing loan may be prepaid.

Pursuant to the 1988 Regulations, the FmHA district office submitted a final report on Paddington's prepayment request to the FmHA state director on August 8, 1988. After expiration of the Heather Creek tenants' 30–day comment period,[4] the FmHA State Director informed the FmHA District Director that Paddington's

---

**4.** No Heather Creek tenant came forward with evidence contrary to the FmHA's basis for its determination during the 30–day comment period.

request to prepay had been approved. The FmHA State Director also informed the District Director that the acceptance of Paddington's prepayment request was conditioned on insertion of the restricted use clause in 7 C.F.R. § 1965.90 Exhibit E–2 in the satisfaction of mortgage. That restrictive use clause protects those who are tenants of the project at the time of prepayment from suffering rent increases as the result of the borrower's prepayment during the time the tenants lease the property.[5] On August 18, 1988, the FmHA district office notified Paddington that the prepayment request had been approved. On August 23, 1988, Paddington tendered the outstanding balance on its Section 515 FmHA mortgage to the FmHA. On September 14, 1988, the satisfaction of Paddington's mortgage was filed. Despite the FmHA State Director's communication to the FmHA District Director that acceptance of Paddington's prepayment offer was specifically conditioned on the inclusion of the restrictive use provision contained in Exhibit E–2 in the satisfaction, no such restrictive use provision was contained in the satisfaction.

On May 22, 1989, plaintiffs' counsel wrote a letter to the FmHA state office indicating that she represented the residents of Heather Creek and it had come to her attention that the FmHA had accepted Paddington's prepayment "largely because the owners agreed to keep Section 8 in place at the project until the contract expires in 1998." Additionally, the letter stated that:

> It is our belief that the Housing and Community Development Act of 1987 required more from the Farmers' Home Administration. Specifically, 42 U.S.C. § 1472(c)(4)(A) requires that in all cases where owners with pre-December 1979 mortgages are applying for prepayment,

the Secretary must offer financial incentives in order to obtain an agreement from the owners to extend the low-income use of the project for an additional 20 years from the date of that agreement. It is my understanding that from my review of the file and a conversation with one of the owners that this was never done. This makes a critical difference for our clients. Even though Section 8 benefits are currently scheduled to run until 1998 an agreement pursuant to § 1472(c)(4)(A) would preserve the low-income use for another 10 years to the year 2008.

Moreover, there are at least two other reasons FmHA acted improperly in allowing this prepayment. From our review of the Satisfaction of the Farmers' Home mortgage which was recorded in this case, and from my conversation with the Recorder's office, it does not appear that any restrictive use provisions were placed in the Satisfaction document or any other document accompanying the prepayment. It would appear from the regulations and FmHA notices in the file that the Satisfaction must contain appropriate restrictive use provisions.

Second, we believe FmHA did not take sufficient action to protect the current tenants in the course of approving this prepayment. Since your agency has apparently determined that the restrictive use clause language set out in Exhibit E–2 is the most appropriate language for insertion in the Satisfaction, we are presuming that the district office authorized this prepayment pursuant to Exhibit E(IV)(A)(2). This provision, as well as the statute, require that the borrower be obligated to ensure that tenants of the housing project will not be displaced due to a change in the use of the housing or

---

**5.** 7 C.F.R. § 1965.90 Exhibit E–2 is the same in the 1988 Regulations and the 1990 Regulations and provides:

> The owner and any successors in interest agree to use the housing for the purpose of housing low- and moderate-income people eligible for occupancy as provided in FmHA regulations then extant. A tenant may seek enforcement of this provision as well as the Government. No eligible person occupying

the housing shall be required to vacate because of early prepayment. The owner also agrees to keep a notice posted at the project, in a place available for tenant inspection, stating that the project is to be used in accordance with the Housing Act and that management practices and rental rates will be consistent with those necessary to maintain the project for low- and moderate-income tenants.

to an increase in rental or other charges, as a result of the prepayment. The owner's intention to continue Section 8 benefits until 1998 may protect the tenants until that time, but there appears to be nothing which would protect them from displacement or rent increases as a result of the prepayment after that time. Absent this sort of protection, plus the fact that no incentives were offered, and the Satisfaction did not comply with the law, the prepayment should not have been approved and is, we alleged, illegal. Plaintiffs' counsel added that "FmHA should take all action necessary to rescind the prepayment," and, in effect, that the FmHA should then follow the procedures for prepayment outlined in the Preservation Act.

After receiving plaintiffs' counsel's letter, FmHA officials arranged a meeting with the Paddington partners. FmHA explained to Paddington that it was necessary to file a corrective satisfaction in order to conform Paddington's prepayment to the provisions of the Preservation Act. Paddington did not agree to the filing of the corrected satisfaction. Notwithstanding Paddington's refusal to agree to the filing to the corrected satisfaction, the FmHA filed a corrected satisfaction which contained the restrictions outlined in 7 C.F.R. § 1965.90 Exhibits E1–7. In effect, the corrected satisfaction provides that the section 8 subsidy will remain in place for 20 years, until October 31, 1997, and that at the end of that period the property will be offered for sale to a qualified nonprofit organization or public agency.

Notwithstanding the FmHA's filing of the corrected satisfaction on Heather Creek, plaintiffs believe that their rights have been violated and that they are exposed to eventual displacement from Heather Creek. Consequently, on October 17, 1989, plaintiffs filed this action seeking recision of FmHA's acceptance of Paddington's prepayment. Both Paddington and the Federal Defendants have answered plaintiffs' complaint. Additionally, Paddington has filed a cross-claim against the Federal Defendants alleging that the FmHA's filing of the corrected satisfaction breached the contract between Paddington and the FmHA and amounts to an unconstitutional taking of Paddington's property without compensation.

All of the parties now have motions pending before the court. Plaintiffs have moved for summary judgment on the claims contained in their complaint. Paddington has moved to dismiss plaintiffs' complaint against it, and has also moved for summary judgment declaring the Preservation Act to be unconstitutional as applied to Paddington and directing the FmHA to remove the corrected satisfaction the FmHA filed with respect to Heather Creek. The Federal Defendants have moved to dismiss and for summary judgment with respect to the claims alleged in plaintiffs' complaint and have moved for summary judgment on Paddington's cross-claim against them.

## DISCUSSION OF LAW

All of the parties have moved for summary judgment. Additionally, Paddington and the Federal Defendants have moved to dismiss plaintiffs' complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Because the court has considered material beyond the pleadings, the court will treat the motions to dismiss as motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. *See* Fed.R.Civ.P. 12(b)(6).

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." This standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

Stated in the negative, summary judgment will not lie if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* at 248, 106 S.Ct. at 2510. In order for the moving party to prevail, it must demonstrate to the court that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986); Fed.R.Civ.P. 56(c). A fact is material only when its resolution affects the outcome of the case. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. On a motion for summary judgment, all evidence and inferences are to be viewed in a light most favorable to the nonmoving party. *Id.* at 250, 106 S.Ct. at 2511. The nonmoving party, however, may not rest upon mere denials or allegations in the pleadings, but must set forth specific facts sufficient to raise a genuine issue for trial. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553. Moreover, if a plaintiff cannot support each essential element of its claim, summary judgment must be granted because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial. *Id.* at 322–23, 106 S.Ct. at 2552–53. With this standard at hand, the court will consider the parties' motions.

A. *The Issues*

Plaintiffs have alleged five claims in their complaint. First, plaintiffs allege that:

> By failing to make reasonable efforts to enter into an agreement with the borrower under which the borrower will make a binding commitment to extend the low-income use of the project 20 years from the date of the agreement, defendants have violated 42 U.S.C. § 1472(c)(4)(A) and 5 U.S.C. §§ 702, 706.

Second, plaintiffs challenge the validity of the 1988 Regulations and allege that the FmHA violated the Preservation Act by enacting those Regulations. The parties now agree that by enacting the 1990 Regulations, the FmHA has complied with the Preservation Act and thus plaintiffs' second claim is moot. Consequently, the court will not address that claim. Third, plaintiffs contend that "[b]y failing to take steps to insure that plaintiffs will not be displaced due to the change in the use of the housing or rent increases after the expiration of the Section 8 contract in 1998," defendants have violated the Preservation Act and the Regulations relating thereto. Fourth, plaintiffs allege that "[b]y concluding that plaintiffs will not be displaced due to a change in the use of the housing or rent increases after the Section 8 contract terminates ... defendants have made a finding which is arbitrary and capricious and clearly erroneous in violation of 5 U.S.C. §[§] 702, 706." Finally, plaintiffs allege that "[b]y making a decision to permit payment before providing the affected residents with any notice or opportunity to comment upon or object to the determination," defendant FmHA has violated plaintiffs' rights under the due process clause of the 5th and 14th Amendments and the regulations relating to the Preservation Act.

Plaintiffs first, third and fourth claims all allege that defendants have violated the Preservation Act and/or the regulations relating to the Preservation Act. Plaintiffs fifth claim alleges that defendant FmHA violated plaintiffs' constitutional and statutory rights.

In its amended answer and cross-claim, Paddington alleges as an affirmative defense that the Preservation Act is unconstitutional as applied to Paddington's pre–1979 Section 515 loan. Paddington contends that if the Preservation Act is held to apply to its pre–1979 Section 515 loan, "it will constitute a breach of the contractual agreements of the United States entitling [Paddington] to damages for the diminution in the value of the property. Said reduction in value constituting a 'taking' of [Paddington's] property rights entitling it to compensation."

The initial determination that the court must make is whether the Preservation Act is constitutional as applied to Paddington's pre–1979 Section 515 loan. Second, the court will address Paddington's cross-claim. Third the court will address the plaintiffs'

first, third and fourth claims. Fourth, the court will address plaintiffs' fifth claim. Finally, having delineated the legal interests at issue, the court will fashion the relief required by law in this case.

### B. Constitutionality of the Preservation Act as Applied

Paddington contends that the Preservation Act is unconstitutional as applied to its pre–1979 Section 515 loan. Specifically, Paddington alleges that the Preservation Act:

> Attempts to place restraints upon Paddington Investor's rights to prepay the Mortgage. The right to prepay the Mortgage is a valuable property right granted by an express contract with the United States and the attempted removal of that right without compensation violates the contract and the guarantees contained in the Fifth Amendment of the United States Constitution.

In support of its position that the Preservation Act abrogates the right to prepay the loan, Paddington points to the language contained in the Promissory Note and Mortgage which underlie its Section 515 loan. Specifically, the Promissory Note states that "[p]repayments of scheduled installments, or any portion thereof, may be made at any time at the option of the Borrower." Additionally, the Promissory Note provides:

> This Note is given as evidence as a loan to Borrower made or insured by the Government pursuant to the Consolidated Farm and Rural Development Act of Title V of the Housing Act of 1949 and for the type of loan as is indicated in the "KIND OF LOAN" block above. This Note shall be subject to the present regulations of the Farmers Home Administration and to its future regulations not inconsistent with the express provisions hereof.

Paddington argues that the provisions of the Promissory Note create a contractual right in favor of Paddington to prepay the Section 515 loan. Paddington further argues that the Preservation Act attempts to nullify Paddington's right to prepayment

and is thus a breach of contract and a taking of a property right without compensation in violation of the fifth amendment. In support of its argument, Paddington cites *Lynch v. United States*, 292 U.S. 571, 579, 54 S.Ct. 840, 843, 78 L.Ed. 1434 (1934), for the proposition that the United States is bound by its contract and the contracts that the government enters into are governed generally by the law applicable to contracts between private individuals. As a general matter, Paddington's reliance on *Lynch* is legally correct. To resolve the issue before the court, however, it is necessary to go beyond the law generally applicable to contracts to which the United States is a party.

In *Bowen v. Public Agencies Opposed to Social Security Entrapment*, the United States Supreme Court held that:

> While the Federal Government, as sovereign, has the power to enter into contracts that confer vested rights, and the concomitant duty to honor those rights, *See Perry v. United States*, 294 U.S. 330, 350–354 [55 S.Ct. 432, 434–436, 79 L.Ed. 912] (1935); *Lynch v. United States*, 292 U.S. 571 [54 S.Ct. 840, 78 L.Ed. 1434] (1934), we have declined in the context of commercial contracts to find that a "sovereign forever waives the right to exercise one of its sovereign powers unless it expressly reserves the right to exercise that power in" the contract.

477 U.S. 41, 52, 106 S.Ct. 2390, 2396, 91 L.Ed.2d 35 (1986), *quoting Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 148, 102 S.Ct. 894, 907, 71 L.Ed.2d 21 (1982). In *Merrion*, the Supreme Court held that "sovereign power, even when unexercised, is an enduring presence that governs all contracts subject to the sovereign's jurisdiction and will remain intact unless surrendered in unmistakable terms." 455 U.S. at 148, 102 S.Ct. at 907. In short, the United States has the sovereign power to amend statutory or regulatory provisions which apply to the terms of the contract and the United States retains that power unless it is waived in "unmistakable terms."

Paddington argues that the above cited provisions of the Promissory Note constitute a waiver of the United States' sovereign power to amend the statutory or regulatory provisions to which the terms of the contract are subject. The court disagrees. The Promissory Note provides that "[p]repayments of scheduled installments or any portion thereof, may be made at any time at the option of borrower." In essence, the Promissory Note provides that the Borrower of a Section 515 loan may prepay any outstanding amount of the loan at any time of their choosing. The Promissory Note also provides that "[t]his Note shall be subject to the present regulations of the Farmers Home Administration and to its future regulations not inconsistent with the express provisions hereof." The real issue is whether the Preservation Act and the regulations enacted pursuant thereto are inconsistent with the express provisions of the Promissory Note. The court concludes that they are not.

The Promissory Note provides borrowers of Section 515 loans with the option of prepaying the loan at any time. The Preservation Act and regulations relating thereto are not inconsistent with the borrower's option to prepay at any time. Rather, the Preservation Act and its regulations simply provide procedures which must be followed in the event that a borrower evidences an intent to prepay a Section 515 loan. The Preservation Act and its regulations do not prohibit a borrower from prepaying any portion of a loan at any time the borrower chooses. The Preservation Act and its regulations merely provide that when a borrower chooses to exercise its option to prepay its Section 515 loan, prepayment shall proceed in a manner consistent with the procedures Congress and the FmHA have established.

The court notes that there is an additional ground on which the Preservation Act and its regulations might well withstand a constitutional attack. As noted above, any waiver of the United States' sovereign power relating to commercial contracts must be made in "unmistakable terms." Although it is not necessary for the court to reach the issue of whether the United States had so waived its power in the Promissory Note on which Paddington relies, if the court engaged in such an analysis it appears that the conclusion would weigh in favor of sustaining the constitutionality of the Preservation Act and its regulations. At the very least, Paddington would have to fight an uphill battle in an effort to establish that the Preservation Act and its regulations were unconstitutional.

Accordingly, the court concludes that the Preservation Act and the regulations promulgated pursuant thereto are constitutional as applied to Paddington's pre–1979 Section 515 loan.

### C. *Paddington's Cross–Claim*

In its cross-claim, Paddington asserts that in preparing and filing the corrective satisfaction of mortgage for Heather Creek, the FmHA has placed a cloud on Paddington's title on Heather Creek and has affected the marketability and value of Heather Creek. Paddington asserts that in filing the corrective satisfaction, the FmHA violated the contract provisions between itself and Paddington. Moreover, Paddington asserts that the Preservation Act is unconstitutional as applied to Heather Creek because the application of the act amounts to an unconstitutional taking of Paddington's property without due process and compensation. The court will address these contentions in reverse order.

Paddington argues that the Preservation Act amounts to an unconstitutional taking of Paddington's property right to prepay its Section 515 loan. The court concluded above that the Preservation Act and its regulations are not inconsistent with the express provisions of the promissory note executed in connection with the FmHA's financing of Heather Creek. Paddington now contends that the Preservation Act, as applied to its Section 515 loan, amounts to a taking without compensation of Paddington's property right to prepay the Section 515 loan. The court disagrees.

In determining whether there has been a taking under the fifth amendment,

the court must conduct an individualized assessment of the facts of a particular case. *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1005, 104 S.Ct. 2862, 2874, 81 L.Ed.2d 815 (1984). The United States Supreme Court has identified three factors which are of particular significance in determining whether a taking has occurred. The three factors are "(1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action." *Connolly v. Pension Benefit Guarantee Corp.*, 475 U.S. 211, 224–25, 106 S.Ct. 1018, 1026, 89 L.Ed.2d 166 (1986) (quoting *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978)). Assuming, without deciding, that Paddington has a constitutionally protectible property right in prepayment of its Section 515 loan, that right has not been sufficiently encumbered to constitute a taking under the fifth amendment. As indicated above, the Preservation Act does not deprive Paddington of the ability to prepay its loan. Rather, the Preservation Act simply provides various procedural guidelines which must be complied with before the FmHA can accept prepayment of a Section 515 loan. One point which is noteworthy, but not mentioned above, is that under the Preservation Act a borrower such as Paddington will always receive fair market value for the property at issue.[6] Consequently, the economic impact of the Preservation Act on Paddington is not detrimental. Similarly, the investment-backed expectations underlying Heather Creek will not be substantially interfered with. Taking these two points together with the fact that in enacting the Preservation Act, Congress was merely altering a regulation of a previously-regulated field, it becomes clear that the Preservation Act as applied to Heather Creek does not amount to an unconstitutional taking of Paddington's property in violation of the fifth amendment.

■ Paddington next argues that the filing of the corrective satisfaction violates the contract between FmHA and Paddington. This argument has more merit. There is serious doubt whether the corrective satisfaction filed with respect to Heather Creek is legally effective or enforceable. In part this doubt stems from the fact that under both Minnesota law and the Preservation Act regulations, the limitations on title contained in the corrective satisfaction presuppose an agreement between two parties. Simply put, such limitations as those contained in the corrective satisfaction are usually enforceable only if both parties have consented to the filing of such a satisfaction. *See* 7 C.F.R. Pt. 1965, subpt. B, Exhibit E–1–E–4 (outlining various restrictive-use provisions to be placed on projects financed with Section 515 loans. Each restrictive-use provisions begins with the phrase "[t]he owner [or borrower] and any successors in interest *agree* to use the housing for the purpose of housing low- and moderate-income people...."); *In re Turners Crossroad Development Co.*, 277 N.W.2d 364, 369 (Minn.1979) (indicating that covenants on real property must be construed in accordance with the intent of the covenanting parties) (citing *Kettle River R.R. v. Eastern Ry.*, 41 Minn. 461, 471, 43 N.W. 469, 473 (1889); Restatement, Property, § 531 (1944)); 5 *Powell on Real Property*, § 670 [2] (1991) (indicating that a covenant is an agreement). Such is not the case here. When the FmHA accepted Paddington's prepayment offer it did so without including any restrictions such as those contained in the corrective satisfaction in the original satisfaction filed with respect to Heather Creek. The FmHA has attempted to correct that oversight by filing

---

**6.** The Preservation Act provides that even when Section 515 property is offered for sale to a qualified nonprofit organization or public agency, it must be offered at fair market value. Under the Preservation Act, fair market value is determined by:

2 independent appraisers, one of whom shall be selected by the Secretary and one of whom shall be selected by the borrower. If the 2 appraisers fail to agree on the fair market value, the Secretary and the borrower shall jointly select a third appraiser, whose appraisal shall be binding on the Secretary and the borrower.

42 U.S.C. § 1472(c)(5)(A)(i).

the corrective satisfaction to which Paddington did not consent. Such action amounts to a unilateral attempt to vary the contract terms to which the FmHA and Paddington had agreed. The law cannot tolerate nor respect such unilateral amendments.

The court has concluded that the Preservation Act, as applied to Heather Creek, does not constitute a taking of property in violation of the fifth amendment. On the other hand, the court has also concluded that the FmHA's filing of the corrective satisfaction is of dubious legal impact and, notwithstanding its legal effectiveness, should be relieved of its harmful force. As will be seen in the remedy section below, the court will accomplish this in an indirect manner.

### D. *Plaintiffs' First, Third, and Fourth Claims*

■ Plaintiffs allege in the first, third, and fourth claims of their complaint[7] that by accepting Paddington's prepayment of its pre–1979 Section 515 loan, defendants have violated the Preservation Act and/or the regulations relating thereto and 5 U.S.C. §§ 702, 706. The provisions of the Preservation Act and its regulations are outlined above. 5 U.S.C. § 702 provides in pertinent part that:

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.

Under 5 U.S.C. § 702, the court will review the FmHA's action in accepting Paddington's prepayment of its Section 515 loan.

In their first, third, and fourth claims, plaintiffs allege that the manner in which the FmHA accepted Paddington's prepayment of the loan violates the Preservation Act and/or its regulations. In support of these allegations, plaintiffs point to: (1) the FmHA's failure to make reasonable efforts to enter into an agreement with Paddington under which Paddington would commit to extend the low income use of Heather Creek for 20 years from the date of the agreement; and (2) the FmHA's failure to take steps to ensure that plaintiffs will not be displaced due to a change in the use of the housing or rent increases after the expiration of the Section 8 contract in 1998. The plaintiffs' contentions have some merit. Indeed, the FmHA does not deny that it never offered Paddington economic incentives before accepting prepayment. Additionally, the FmHA does not deny that Paddington's prepayment was approved without the attachment of any restrictive covenants to the satisfaction of the mortgage. Notwithstanding these admissions, however, the FmHA contends that its failure to comply with the technical requirements of the Preservation Act and its regulations are inconsequential.

The Federal Defendant's argument is twofold. First, the Federal Defendants argue that offering economic incentives to Paddington in order to entice Paddington to enter into an agreement extending the low income use of Heather Creek would

---

7. Paddington contends that plaintiffs lack standing to bring this action and that the court should dismiss the case without reaching the merits. Citing *Association of Data Processing Service Organization, Inc. v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), Paddington contends that plaintiffs lack standing to bring this case because plaintiffs have failed to demonstrate that the challenged action has caused *plaintiffs injury in fact or that they have been* subjected to an imminent danger of harm. Plaintiffs respond that under *Camp* an injury in fact need not be economic. 397 U.S. at 152–54, 90 S.Ct. at 829–30. Plaintiffs contend that they have been injured in three ways: (1) deprivation of statutory benefits which would insure the future affordability of their homes; (2) deprivation of other benefits, including access to a

grievance and appeals procedure, and protections against evictions; and (3) anxiety and emotional distress over the uncertainty of their futures. Although the court is not convinced that each of these alleged injuries independently provides plaintiffs with standing to bring this action, parties such as plaintiffs herein have been allowed to bring lawsuits challenging actions which affect their future opportunity to obtain housing. *See Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 264, 97 S.Ct. 555, 562, 50 L.Ed.2d 450 (1977); *Allen v. Pierce*, 689 F.2d 593, 595 n. 5 (5th Cir.1982). Accordingly, the court concludes that plaintiffs have standing to bring this action and will proceed to consider the merits of this case.

have been meaningless because Paddington would never have entered into such an agreement. Second, the Federal Defendants argue that any harm which resulted from the failure to follow the procedure required by the Preservation Act was remedied by the filing of the corrective satisfaction on the Heather Creek property. The Federal Defendants contend that the corrective satisfaction contains the very provisions the Preservation Act requires and thus plaintiffs will receive the protections Congress intended in the Preservation Act even though plaintiffs will receive those benefits in a manner not specified by the Preservation Act. In short, the Federal Defendants contend that although the procedural technicalities of the Preservation Act may not have been followed, the substantive protections at which the Preservation Act aims have been secured.

Under the parties' characterization of the dispute, it is clear that certain procedural requirements of the Preservation Act have been violated and that the FmHA have taken certain actions in an effort to remedy the harm which resulted from those violations. The issue before the court is whether the filing of the corrective satisfaction cures the injuries of which plaintiffs complain, that is, whether the corrective satisfaction is effective. In the numerous pages of briefing filed in connection with this matter the parties, particularly the Federal Defendants, have devoted scant attention to this issue. The Federal Defendants appear to argue that because nothing in the Preservation Act or its regulations prevents the FmHA from filing corrective satisfactions such as that filed on Heather Creek, the corrective satisfaction is effective. (*See* Memorandum in Support of Federal Defendants' Motion to Dismiss and for Summary Judgment at 23 n. 20). Plaintiffs address the issue more directly. Plaintiffs rely on both state real estate law and the language of 7 C.F.R. § 1965.90 Exhibit E–1 in support of its contention that the corrective satisfaction is not effective or legally enforceable. After examining the sources cited by plaintiffs the court concludes that, at a minimum, it is seriously doubtful whether the corrective satisfaction is legal-

ly effective. Accordingly, the Federal Defendants' efforts to remedy the harm done by failing to comply with the Preservation Act are of dubious legal effect and clearly do not provide plaintiffs with the protections contemplated by Congress.

The FmHA accepted Paddington's prepayment on Heather Creek in a manner that violated the Preservation Act and its regulations. Moreover, the FmHA's attempts to remedy the harms occasioned by its acceptance of Paddington's prepayment fall short of the mark. The appropriate remedy for these violations will be considered below.

### E. *Plaintiffs' Fifth Claim*

In their fifth claim, plaintiffs contend that the FmHA's decision to permit prepayment before providing plaintiffs with any notice or opportunity to comment upon or object to that determination violated plaintiffs' rights under the due process clause of the fifth and fourteenth amendments and the Preservation Act regulations. Specifically, plaintiffs focus on the FmHA's failure to notify plaintiffs that they had a right to appeal the FmHA's decision to accept Paddington's prepayment offer. The court will first consider plaintiffs' contentions as they relate to the regulations adopted pursuant to the Preservation Act. The court will then address plaintiffs' contentions regarding their due process rights.

Plaintiffs contend that the FmHA violated the Preservation Act regulations by failing to notify them that they could appeal the FmHA's decision to accept Paddington's prepayment offer. In support of this contention plaintiffs cite 7 C.F.R. Part 165, subp. B, Exhibit E, § V.B (1991), which provides in pertinent part:

> Tenants will be given a 30–day notice prior to the prepayment, by the District Office. Tenants will be further advised that if they feel a prepayment has been accepted without compliance with the conditions outlined in this Exhibit, a review by the state Director may be requested.

*Id.* The pertinent provisions of the notice which the FmHA sent to plaintiffs are out-

**1490**

lined in the factual background section above. A review of that notice reveals that plaintiffs were not informed of their right to appeal the decision to accept the prepayment offer. The FmHA does not contend that plaintiffs were notified of their right to request a review by the State Director. Rather, the FmHA argues that plaintiffs' federal assistance was not substantially reduced or terminated as those terms are used in 42 U.S.C. § 1480(g) and thus plaintiffs were not entitled to receive notice of their right to appeal.

Under 42 U.S.C. § 1480(g), the Secretary of Agriculture is authorized to issue rules and regulations which assure that persons whose federal assistance is being substantially reduced or terminated are notified of the reduction or termination and are provided an opportunity to appeal the decision that led thereto. The Federal Defendants appear to argue that because 7 C.F.R. Part 1965, subp. B, Exhibit E, § V.B was enacted pursuant to 42 U.S.C. § 1480(g), and because plaintiffs' federal assistance is not being substantially reduced or terminated, plaintiffs are not entitled to notification of their right to appeal the FmHA's decision to accept Paddington's prepayment offer. This argument is at odds with the plain language of the regulation. The regulation provides that if the FmHA determines that a prepayment offer can be accepted, then tenants will be advised of their right to request a review by the State Director. The regulation does not condition the notification of tenants of their right to appeal the FmHA's decision on a loss or substantial reduction in the tenant's federal assistance. It is well settled that federal agencies have broad discretion in adopting regulations pursuant to congressional enactments. Once those regulations are adopted, however, agencies must comply with them. *See Diaz v. INS*, 648 F.Supp. 638, 647 (E.D.Cal.1986) (citing *Confederated Tribes and Bands of Yakima Indian Nation v. Federal Emergency Regulatory Comm'n*, 746 F.2d 466, 474 (9th Cir.1984)).

Here a regulation has been adopted which requires tenants to be noti-

fied of their right to appeal a prepayment decision once it is determined that prepayment can be accepted. The plaintiffs in this case are such tenants to whom such notification was never provided. Accordingly, the FmHA has failed to comply with 7 C.F.R. Part 1965, subp. B, Exhibit E, § V.B (1991). The relief which is appropriate to remedy this violation is discussed below.

Plaintiffs next argue that the FmHA's failure to notify them of their right to appeal the acceptance of Paddington's prepayment offer violated plaintiffs' rights under the due process clause of the fifth and fourteenth amendments. As an initial matter, the court notes that the plaintiffs have a claim, if any, only under the fifth amendment. The fourteenth amendment does not apply to actions by the federal government. *Shelly v. Kraemer*, 334 U.S. 1, 13, 68 S.Ct. 836, 842, 92 L.Ed. 1161 (1948). Additionally, the court notes that in light of its conclusion above regarding the validity of the notice under FmHA regulations, it is not absolutely necessary to reach plaintiffs' due process claims. Notwithstanding this fact, the court will consider the plaintiffs' due process claims in an effort to clarify the rights which have been violated in this case and thus the wrongs which must be remedied.

The analysis of plaintiffs' due process claim is twofold. First, the court must determine whether plaintiffs have a property interest which is protected by the fifth amendment. Second, if plaintiffs have such a property interest, then the court must determine whether plaintiffs received the process due under the circumstances of this case.

Due process requirements attach only where plaintiffs assert a property interest protected by the fifth amendment. *Board of Regents v. Roth*, 408 U.S. 564, 570–71, 92 S.Ct. 2701, 2705–06, 33 L.Ed.2d 548 (1972). For a particular benefit to constitute a property right, a claimant must have more than a unilateral expectation of receiving the benefit. Rather, the claimant must have a legitimate claim of entitlement to it. *Id.* at 577, 92 S.Ct. at 2709. Plain-

tiffs contend that the FmHA violated plaintiffs' rights under the Preservation Act by accepting Paddington's prepayment offer in a manner that did not conform with the requirements of the act. In order for plaintiffs to prevail on their due process claim, they must first establish that their rights under the Preservation Act constitute a property interest protected by the fifth amendment. On this point the parties disagree. The court will not decide this issue because, even assuming that plaintiffs' rights under the Preservation Act constitute a property interest protected by the fifth amendment, the FmHA has afforded plaintiffs all the process due under the circumstances.

The Supreme Court's decisions have "established that 'due process' is a flexible concept—that the processes required by the clause with respect to the termination of a protected interest will vary depending upon the importance attached to the interest in the particular circumstances under which the deprivation may occur." *Walters v. National Ass'n of Radiation Survivors,* 473 U.S. 305, 320, 105 S.Ct. 3180, 3189, 87 L.Ed.2d 220 (1985) (citing *Mathews v. Eldridge,* 424 U.S. 319, 334, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976); *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972)). The due process clause requires a notice that is reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action, and afford them an opportunity to present their objections. *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950). To be adequate under the due process clause, a notice must provide sufficient information to permit adequate preparation for the opportunity to respond. *Memphis Light, Gas & Water Div. v. Craft,* 436 U.S. 1, 14, 98 S.Ct. 1554, 1563, 56 L.Ed.2d 30 (1978). When undertaking a due process analysis, the court must balance the competing interests at stake. *See Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 542, 105 S.Ct. 1487, 1493, 84 L.Ed.2d 494 (1985). In the instant case the primary interests at stake are the plaintiffs' interest in retaining low income housing and the government's interest in limiting the administrative burden of providing extensive notice to plaintiffs of the manner in which plaintiffs' rights are being affected. Consideration of these interests in light of the facts of this case leads to the conclusion that the notice provided to the plaintiffs was not constitutionally deficient.

The notice dated July 8, 1988, which the FmHA sent to plaintiffs contained a constitutionally sufficient amount of information pertinent to Paddington's intent to prepay its Section 515 loan. The court finds that two pieces of information contained in the notice are of particular moment.

First, the notice indicated that the prepayment would be accepted because the FmHA had determined that there would be no change in plaintiffs' rent. Second, the notice clearly indicated that plaintiffs had 30 days from the date of the notice to present evidence contrary to the basis for the FmHA's determination regarding the acceptance of prepayment. An examination of the interest at issue indicates that the notice was sufficient. As stated in the notice, the FmHA had made a determination that the plaintiffs' rent would not be increased as a result of the prepayment. Thus, the plaintiffs' immediate interest in low income housing was not substantially hindered by the FmHA's decision to accept Paddington's prepayment offer.[8]

The notice itself was sufficient to make plaintiffs aware of Paddington's intent to prepay its Section 515 loan and, most important, provided plaintiffs an opportunity to comment on the FmHA's decision to accept that prepayment. Plaintiffs argue that "[t]he notice given to tenants herein does nothing to hint at the range of legal

---

**8.** Although this conclusion does not necessarily apply to plaintiffs' long-term interest in low income housing, it does indicate, at a minimum, that the FmHA did not disregard plaintiffs' interest in low income housing when it decided to accept Paddington's prepayment offer. The FmHA was mindful of plaintiffs' interest in low income housing and drafted a notice which was reasonably calculated to protect against the threat posed to that interest.

protections available under [the Preservation Act] which the agency is declining to apply, or the criteria the agency uses to judge them." (Plaintiffs' Response to Summary Judgment Motions of Federal Defendants and Paddington at 5). Plaintiffs have never specifically outlined the notice they believe is necessary to comport with the due process requirements of the fifth amendment. In light of plaintiffs' argument quoted above, however, it seems that plaintiffs would have the FmHA distribute a lengthy notice detailing the provisions of the Preservation Act and its regulations. Such a requirement would not only impose a substantial burden on the FmHA but might well lead to confusion of tenants such as plaintiffs herein. Consequently, the court cannot conclude that the due process clause of the fifth amendment would require the taking of such measures.

Plaintiffs' reliance on *Ponce v. Housing Authority of County of Tulare,* 389 F.Supp. 635 (E.D.Cal.1975), is similarly misplaced. *Ponce* involved rental increases in a federally funded housing project. In that case the court held that the FmHA had violated the tenants' due process rights because "the FmHA simply did not give the tenants involved notice of *any* kind prior to the approval of rent increases." *Id.* at 652 (emphasis in original). The instant case is distinguishable. Not only did the FmHA provide the plaintiffs with the notice described above, but the notice was dated July 8, 1988, and specifically stated that "[u]nder no circumstances will prepayment be accepted before August 8, 1988." Thus, plaintiffs were provided with notice sufficient in the circumstances and at a time which made the notice meaningful and provided plaintiffs with an opportunity to react. *See Loudermill,* 470 U.S. at 572, 105 S.Ct. at 1510 (citing *Boddie v. Connect-*icut, 401 U.S. 371, 379, 91 S.Ct. 780, 786, 28 L.Ed.2d 113 (1971)) (describing "the root requirement" of the due process clause as being "that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest.") (emphasis in original) (footnote omitted). Based on the foregoing, the court concludes that although the notice FmHA provided plaintiffs did not conform to the regulations adopted pursuant to the Preservation Act, that notice was nonetheless constitutionally sufficient so as not to violate plaintiffs' due process rights under the fifth amendment.[9]

### F. Righting the Wrongs: Relief for the Statutory and Regulatory Violations

Each of the parties now before the court has requested a different form of relief. Plaintiffs argue that the FmHA's decision to permit Paddington's prepayment should be set aside and Heather Creek should be restored to the Section 515 program. Paddington requests the court to dismiss plaintiffs' complaint and order the FmHA to prepare and file a new corrective satisfaction removing all the restrictions on the use of Heather Creek contained in the corrective satisfaction dated June 19, 1989. The Federal Defendants maintain that although some of the technical requirements of the Preservation Act and its regulations have not been followed with respect to Paddington's prepayment of its Section 515 loan, the filing of the corrective satisfaction has remedied the harm resulting therefrom. Consequently, the Federal Defendants request the court to simply dismiss this action and allow the status quo to persist. The court has concluded that a middle road which most closely approximates plaintiffs' and Paddington's requested relief is the most appropriate remedy in this action.

---

**9.** The court notes that its conclusion that the FmHA failed to comply with the notice requirements of 7 C.F.R. Part 1965, subp. B, Exhibit E, § V.B (1991) is not inconsistent with its conclusion that the FmHA provided plaintiffs with notice which was not constitutionally defective. *See Jeffries v. Olesen,* 121 F.Supp. 463, 476 (S.D.Cal.1954) (holding that "where administrative regulations set a higher standard of proce-dural due process than that required by the Constitution or the statute, violation amounts to a denial of *administratively*-established due process of law.") (citing *U.S. ex rel Accardi v. Shaughnessy,* 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954); *Bridges v. Wixon,* 326 U.S. 135, 153, 65 S.Ct. 1443, 1452, 89 L.Ed. 2103 (1945)) (emphasis added).

Plaintiffs have requested relief under 5 U.S.C. § 706. That statute provides in pertinent part:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
>
> (1) compel agency action unlawfully withheld or unreasonably delayed; and
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
>
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> (B) contrary to constitutional right, power, privilege, or immunity;
>
> . . . .
>
> (D) without observance of procedure required by law.

Under 5 U.S.C. § 706(2)(A), the court has the power to set aside agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." The court concluded above that the FmHA violated the Preservation Act and its regulations in the manner in which it accepted Paddington's prepayment. The FmHA's actions were clearly not in accordance with the law. Under 5 U.S.C. § 706(2)(A) the court will set aside the FmHA's acceptance of Paddington's prepayment of the Section 515 loan which was used to finance Heather Creek. Paddington's loan and Heather Creek will be returned to the Section 515 program and will be administered in accordance with the statutes and regulations relating thereto.

This remedy, authorized by 5 U.S.C. § 706 and the court's equitable powers, will most directly effectuate the intent of Congress embodied in the Preservation Act. The rescission of a federal agency's acceptance of prepayment on a federally financed loan is not without precedent. *See, e.g., Orrego v. HUD*, 701 F.Supp. 1384, 1398 (N.D.Ill.1988) (setting aside HUD's acceptance of prepayment of federally financed loan). The court's primary concern is that this remedy may detrimentally impact Paddington and its interests. The court's concern derives from Paddington's claim that it has been deprived of property without compensation. As the court concluded above, no such taking occurs from the application of the Preservation Act to Paddington's Section 515 loan. Indeed, even when Heather Creek is returned to the Section 515 program, if Paddington pursues prepayment in accordance with the Preservation Act and its regulations, Paddington's interest in Heather Creek may well be returned to the state it was in prior to the FmHA's filing of the corrective satisfaction and the initiation of this lawsuit. A return to the status quo ante regarding Paddington's title to Heather Creek is a distinct possibility especially in light of Paddington's failure to demonstrate that the Preservation Act and its regulations are inadequate to protect its interests. *See, e.g., Thetford Properties v. HUD*, 907 F.2d 445, 449 (4th Cir.1990) (commenting on property owner's failure to demonstrate that the remedies made available by HUD were inadequate).

In the event that Paddington pursues prepayment under the Preservation Act and its regulations after its property is returned to the Section 515 program and such prepayment leads to a substantial alteration in Paddington's title in Heather Creek, Paddington will have other avenues of relief. If Paddington's prepayment efforts lead to a violation of its contract with the FmHA such that Paddington is harmed in excess of $10,000, then Paddington may bring an action against the government in the United States Claims Court under the Tucker Act, 28 U.S.C. § 1491(a)(1). If Paddington is harmed in an amount not exceeding $10,000, then it may bring an action in this court under the Little Tucker Act, 28 U.S.C. § 1346(a)(2). The court notes that if such litigation is initiated against the Federal Defendants herein, and if that litigation leads to a finding of government liability for the diminution in value of Paddington's title to Heather Creek, such a result would not be inconsistent with basic principles of fairness and justice. Indeed, despite the complicated nature of this matter,

the court has not lost sight of the fact that this entire lawsuit was occasioned by the FmHA's improper acceptance of Paddington's prepayment.

Although the court's remedy may saddle Paddington with the burden of additional litigation, such a result is not without justification given the facts of this case. Through its involvement in a regulated industry, and by freely accepting the benefits of a program administrated by a government agency, Paddington was on notice that it had to comply with certain regulations in the processing and administration of its Section 515 loan. Indeed, when Paddington first inquired about prepayment of its loan, the FmHA provided Paddington with detailed instructions on how the Preservation Act would govern its prepayment application. The FmHA specifically informed Paddington which restrictive covenant would apply to Paddington's title in Heather Creek. Moreover, when Paddington filed its prepayment application, it followed FmHA instructions and regulations. Paddington will not now be heard to complain of the inequities which have resulted from the FmHA's failure to properly apply the Preservation Act to Paddington's Section 515 loan.[10] The state of Paddington's title in Heather Creek prior to the filing of the corrective satisfaction was merely a windfall occasioned by the oversight or ignorance of government administrators. The court's remedy will merely deprive Paddington of the benefit of that windfall and return all of the parties to a position in accordance with their reasonable expectations at the time Paddington manifested its intent to prepay its Section 515 loan on Heather Creek.

In light of the court's remedy, it will no longer be necessary for the FmHA to enforce the provisions of the corrective satisfaction which it filed with respect to Heather Creek. Accordingly, the FmHA will be ordered to do whatever is necessary to relieve the restrictive covenant filed with respect to Heather Creek of whatever legal authority it may have.

The court is convinced that this remedy will effectuate the intent of Congress and return the parties to a position which harmonizes with their legitimate rights and expectations under applicable law.

## CONCLUSION

In accordance with the foregoing, IT IS HEREBY ORDERED that:

1. The FmHA's acceptance of Paddington's prepayment on its Section 515 loan used to finance Heather Creek, is rescinded;

2. Paddington's Section 515 loan used to finance Heather Creek shall be returned to and administered in accordance with the Section 515 program;

3. The FmHA shall take whatever measures are necessary to relieve the corrective satisfaction dated June 19, 1990, and filed with respect to Heather Creek of whatever legal effect it may have;

4. Plaintiffs' motion for summary judgment is granted in part and denied in part as delineated herein;

5. Paddington's motion to dismiss is denied;

6. Paddington's motion for summary judgment in granted in part and denied part as delineated herein;

7. The Federal Defendants' motion to dismiss is denied; and

8. The Federal Defendants' motion for summary judgment is granted in part and denied in part as delineated herein.

---

10. The court's refusal to find that the FmHA's acceptance of Paddington's prepayment is not subject to rescission is not without legal support. *See, e.g., Office of Personnel Management v. Richmond,* —— U.S. ——, 110 S.Ct. 2465, 2471–76, 110 L.Ed.2d 387 (1990) (holding that erroneous advice given by a government employee to a claimant of federal benefits cannot estop the government from denying benefits not otherwise permitted by law); *Heckler v. Community Health Services of Crawford,* 467 U.S. 51, 61–62, 104 S.Ct. 2218, 2224–2225, 81 L.Ed.2d 42 (1984) (United States not estopped from recovering overpayment of Medicare reimbursement for salaries of employees, notwithstanding reliance on oral advice to the contrary).