13 F.3d 1192
 62 USLW 2443
 PARKRIDGE INVESTORS LIMITED PARTNERSHIP, by Harold MORTIMER,
David Mortimer, and John Phelps, General Partners, Appellant,
v.
FARMERS HOME ADMINISTRATION, an Agency of the United States
Department of Agriculture, Appellee.
 No. 93-1270.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Oct. 12, 1993.
Decided Jan. 7, 1994.
 
 Ronald W. Banks, Rapid City, SD, argued, for appellant.
 Robert A. Mandel, Rapid City, SD, argued (Ted L. McBride and Robert A. Mandel, on the brief), for appellee.
 Before RICHARD S. ARNOLD, Chief Judge, WOLLMAN and LOKEN, Circuit Judges.
 RICHARD S. ARNOLD, Chief Judge.
 
 
 1
 This case is about the power of the United States to modify its contractual obligations, by statute, to prevent the frustration of clear program purposes. We sympathize with the view of appellant, Parkridge Investors, that the United States has acted unfairly in this instance; even so, we conclude that firmly entrenched legal doctrine allows the government to act as it did. Therefore, we decline to hold unconstitutional the Emergency Low Income Housing Preservation Act, 42 U.S.C. Sec. 1472(c), as applied to appellant's loan, and thus affirm the District Court's[1] grant of summary judgment in favor of appellee Farmers Home Administration (FmHA).
 
 I.
 
 2
 The Rural Rental Housing Program, Section 515 of the Housing Act of 1949, 42 U.S.C. Sec. 1485, was enacted to ameliorate housing shortages for the elderly and other low-income persons in rural areas. See Lifgren v. Yeutter, 767 F.Supp. 1473, 1477 (D.Minn.1991). Among other provisions, the statute authorizes FmHA to make loans to developers and owners of rural rental units. In exchange, borrowers agree to provide affordable housing over the duration of their government-assisted mortgages. Ibid. The clear objective of the program--expanding the stock of rural rental housing for low-income persons--provides the backdrop for this case.
 
 
 3
 Ridgestone Apartments is a multi-family complex in Deadwood, South Dakota. The 13-unit complex was constructed by the Ridgestone partnership with financing obtained in 1974 from FmHA under the Rural Rental Housing Program. As part of the transaction, FmHA made three loans to the Ridgestone partnership, which were incorporated into the provisions of a promissory note. The note provided, in part, that "[p]repayments of scheduled installments, or any portion thereof, may be made at any time at the option of Borrower." (Emphasis supplied.) This transaction also involved two mortgages, both of which stated that "[t]his instrument shall be subject to the present regulations of the [FmHA], and to its future regulations not inconsistent with the express provisions hereof." (Emphasis supplied.)
 
 
 4
 In 1985, Parkridge bought the complex and assumed the rights and obligations of the Ridgestone partnership. FmHA approved the sale, conditioned upon execution of a new loan agreement and assumption agreements. The assumption agreements provided that predecessor agreements would remain "in full force and effect," except where modified by the new agreements.[2] The assumption agreements also reiterated that they were "subject to present regulations of the [FmHA] and to its future regulations which are not inconsistent with the express provisions hereof." (Emphasis supplied.) The parties agree that, as of that time, Parkridge had a practically unfettered option to prepay.
 
 
 5
 In 1987, Congress passed the Emergency Low Income Housing Preservation Act of 1987, Pub.L. No. 100-242, 101 Stat. 1815, 1877, 1886-90 (1988), 42 U.S.C. Sec. 1472(c) (the Preservation Act). This legislation responded to congressional concern that a large portion of the federally assisted housing stock, including 150,000 units constructed under the FmHA program, was vulnerable to prepayment and therefore removal from the low-income market--thus thwarting the basic purpose of the program. Id. at 1877-78; H.R.Rep. No. 122(I), 100th Cong., 1st Sess. 53, reprinted in 1987 U.S.Code Cong. & Admin.News 3317, 3369-70. The provisions of the Preservation Act are well summarized in a recent Minnesota district court case:
 
 
 6
 Prior to the enactment of the Preservation Act, borrowers of Section 515 loans ... had the option of prepaying their mortgages at any time and removing their project from the program without restrictions....
 
 
 7
 Under the Preservation Act, an owner of a project funded by a ... Section 515 loan who wishes to prepay his outstanding indebtedness must submit a request to pre-pay to the FmHA. Before 30 days pass, the FmHA must notify each tenant of the housing unit as well as interested nonprofit organizations and appropriate state and local agencies that the owner of the project has submitted a request to prepay the Section 515 loan. 42 U.S.C. Sec. 1472(c)(3). The FmHA is not allowed to accept prepayment offers until it complies with certain steps specified in the Preservation Act. First, the FmHA must attempt to enter into an agreement under which the owner of the project commits to extend the low income use of the project for 20 years from the date of such agreement. 42 U.S.C. Sec. 1472(c)(4)(A). Because the Preservation Act aims at extending the low income use of Section 515 projects, the FmHA is authorized to offer various financial incentives to owners who have indicated a desire to pre-pay Section 515 loans.... 42 U.S.C. Sec. 1472(c)(4)(B). If, despite the incentives the FmHA has offered to the owner, the owner will not enter into an agreement to extend the low income use of the project, then the FmHA must require the owner to offer to sell the project to a qualified nonprofit organization or public agency at fair market value. 42 U.S.C. Sec. 1472(c)(5)(A).[3] Once the project is offered for sale to a qualified nonprofit organization or public agency, if 180 days passes without a bona fide offer of purchase being submitted, then the FmHA may accept the owner's prepayment request. 42 U.S.C. Sec. 1472(c)(5)(A)(ii).
 
 
 8
 Lifgren, 767 F.Supp. at 1478 (footnote omitted).[4]
 
 
 9
 FmHA has issued Preservation Act regulations, codified at 7 C.F.R. Sec. 1965.90. Under the relevant provisions,[5] when FmHA receives a prepayment request, it first determines the need for low-income housing, then offers financial incentives to induce the borrower to extend low-income use. 7 C.F.R. Sec. 1965, Exh. E(III-IV). If the borrower refuses to enter into such an agreement, FmHA determines if one of the two narrow exceptions outlined in 42 U.S.C. Sec. 1472(c)(5)(G) applies. 7 C.F.R. Sec. 1965, Exh. E(V). If these exceptions do not apply, the project's fair-market value is determined,[6] and FmHA requires the borrower to offer the project for sale--to a qualified nonprofit organization or public agency--for a period of 180 days. 7 C.F.R. Sec. 1965, Exh. E(VI). Finally, should the borrower receive no bona fide offer by the end of this time period, then FmHA will accept prepayment on the loan--so long as federal funds are either then available to assist a potential purchaser, or have not been available for any project in the nation for 15 months. 7 C.F.R. Sec. 1965, Exh. E(VII).
 
 
 10
 In short, whereas under the old scheme FmHA had to accept prepayment from borrowers like Parkridge at any time, under the Preservation Act FmHA may accept prepayment only at the end of an intricate, six-month-long (or longer) procedure. Moreover, should a willing non-profit or public agency purchaser emerge, the party desiring to prepay may not even wind up in possession of the property.[7]
 
 
 11
 In August of 1990, Parkridge sought permission to prepay its loan under the terms of the loan instruments. FmHA declined the offer and countered with incentives to continue providing housing to eligible persons under an extended loan agreement. Parkridge rejected the incentives and renewed its offer of full payment. Again, FmHA refused, asserting that "the loan documents as amended, including the right to prepay, were modified by the assumption agreements, as well as the mortgages which provided that these loans were subject to regulatory changes which modified the option to prepay...." Jt.App. 44. Instead, FmHA proposed that the apartments be appraised and offered for sale to a non-profit organization, in order to retain the property in the program for the balance of the project's useful life. Parkridge rejected this proposal and sued, seeking a declaration that FmHA is unconditionally obligated to accept the offer of prepayment, because the Preservation Act is unconstitutional as applied to the partnership's loans.
 
 
 12
 The District Court concluded that the Preservation Act passed constitutional muster. Order of Dec. 17, 1992, at 5. In its decision, the Court relied largely on Lifgren v. Yeutter, supra, which held, with respect to contractual provisions virtually identical to those in this case, that the regulations promulgated pursuant to the Preservation Act were not inconsistent with the applicable loan agreements and did not constitute an unconstitutional taking under the Fifth Amendment. 767 F.Supp. at 1485-88. This appeal followed.
 
 II.
 
 13
 On appeal, Parkridge argues that FmHA's refusal to accept prepayment breaches the clear terms of the loan agreements and constitutes a denial of Parkridge's due-process rights and an unconstitutional taking under the Fifth Amendment.[8] In response, FmHA argues that 1) the new legislation is not truly inconsistent with the regulations existing at the time of the initial loan; 2) even if the Preservation Act's terms are inconsistent with the contract, the government's actions were foreseeable given the purposes of the program; 3) the government, through its contract, did not unmistakably waive its sovereign power to amend statutory provisions which pertain to the contract; 4) the case is not yet ripe to determine whether there has been an unconstitutional taking, because Parkridge refused to abide by the prescribed procedures and offer the project for sale; and 5) there could be no unconstitutional taking here because, under the terms of the Preservation Act, Parkridge is guaranteed fair market value for the project.
 
 
 14
 Before proceeding to address Parkridge's central claims, we make three preliminary comments. First, it is undisputed that FmHA has acted in accordance with the Preservation Act and its regulations. Second, if only by virtue of the delay the partnership faces in selling or otherwise making alternative use of its property, Parkridge has already suffered injury sufficient to provide standing to bring suit. Third, we reject outright the notion, advanced by FmHA, that the procedures required under the Preservation Act are consistent with the loan agreements between the agency and Parkridge; we believe that the Lifgren Court was incorrect in this regard. See 767 F.Supp. at 1486. Before the Act, Parkridge could prepay at any time, with virtually no restrictions; now, if the partnership is allowed to prepay at all, it cannot do so until it complies with the Act, a process which may take up to six months to complete. The more likely result is that the partnership will have to sell the project altogether, rather than prepaying and retaining ownership. Perhaps the new requirements could be considered procedural in nature, but, in any event, they are facially inconsistent with the loan agreements.
 
 III.
 
 15
 Beginning with the due-process claim made by Parkridge, we observe that this is not a procedural-due-process case. Parkridge is not claiming that FmHA denied it a hearing or some other form of procedural safeguard. Rather, the partnership is complaining about the likely outcome: that it will be forced to sell the property to a third party, rather than exercising the option to pay off the loan, refinance, and use the property in a more profitable fashion. At a minimum, Parkridge argues, the partnership faces a lengthy and expensive delay in realizing its desire to prepay. Thus, the claim in this case is one of substantive due process, based on the assertion of property rights in the loan agreements. See Thetford Properties IV Limited Partnership v. U.S. Dept. of Housing and Urban Development, 907 F.2d 445, 449 (4th Cir.1990) ("The gravamen of appellants' due process challenge is not the procedure for approving prepayment itself, but rather is Congress' ability to constitutionally condition prepayment at all.").
 
 
 16
 Assuming, without deciding, that the partnership has a protected property interest in its contractual right to prepay the loan obligations, we assess Parkridge's argument that, under the Fifth Amendment, the United States must abide by the terms of its contract, just as if it were a private party. As pointed out by the Lifgren Court, on a general level, Parkridge is correct. See Lynch v. United States, 292 U.S. 571, 580, 54 S.Ct. 840, 844, 78 L.Ed. 1434 (1934); Perry v. United States, 294 U.S. 330, 351-54, 55 S.Ct. 432, 435-36, 79 L.Ed. 912 (1935).[9] However, "contractual arrangements, including those to which a sovereign itself is party, 'remain subject to subsequent legislation' by the sovereign." Bowen v. Public Agencies Opposed to Social Security Entrapment, 477 U.S. 41, 52, 106 S.Ct. 2390, 2397, 91 L.Ed.2d 35 (1986), quoting Merrion v. Jicarilla Apache Tribe, 455 U.S. 130, 147, 102 S.Ct. 894, 906, 71 L.Ed.2d 21 (1982). In Merrion, the Supreme Court observed that "sovereign power ... is an enduring presence that governs all contracts subject to the sovereign's jurisdiction, and will remain intact unless surrendered in unmistakable terms." 455 U.S. at 148, 102 S.Ct. at 907 (quoted with approval in Bowen, 477 U.S. at 52, 106 S.Ct. at 2396). Thus, "contracts should be construed, if possible, to avoid foreclosing exercise of sovereign authority." Bowen, 477 U.S. at 52-53, 106 S.Ct. at 2397.
 
 
 17
 The key language of Parkridge's loan agreements makes its contract subject to "[FmHA's] future regulations which are not inconsistent with the express provisions hereof." Future regulations of FmHA, however, are not synonymous with future acts of Congress. The United States cannot be said to have unmistakably waived one of its most vital powers, that of enacting legislation, by virtue of this contract language.[10] Moreover, the clear objectives of the Rural Rental Housing Program were necessarily known to the borrower, Parkridge.[11] Parkridge could have foreseen that Congress might amend the program's enabling legislation if necessary to carry out the purposes of the program. Cf. Bowen, 477 U.S. at 52, 106 S.Ct. at 2396. Although government involvement can serve to enhance the attractiveness of property, its involvement may also increase certain types of risk; Parkridge embraced that risk when it assumed Ridgestone's loan obligations in 1985. Therefore, given that Parkridge contracted with FmHA in the context of the clear goals of the Rural Rental Housing Program, and given that the United States did not clearly waive its sovereign power to modify its obligations via statute, we hold that the United States did not violate the substantive-due-process rights of Parkridge by altering the terms of the loan agreement through the Preservation Act.[12]
 
 IV.
 
 18
 Parkridge also argues that the government has effected an unconstitutional taking by refusing to accept Parkridge's offer to prepay and by requiring the partnership to go through the process established by the Preservation Act. Again assuming, without deciding, that Parkridge has a protected property interest in the right to prepay its loan obligations, we determine, first, whether a compensable taking has occurred.
 
 
 19
 The Supreme Court has identified two types of regulatory action which categorically constitute takings, and thereby mandate compensation under the Fifth Amendment. The first type of taking occurs when a property owner suffers a physical invasion of property. Lucas v. South Carolina Coastal Council, --- U.S. ----, ----, 112 S.Ct. 2886, 2893, 120 L.Ed.2d 798 (1992). The second type of taking occurs when the government regulation "denies all economically beneficial or productive use" of the property. Ibid. Neither category applies here. In situations not encompassed by these categories, the Supreme Court has instructed courts to engage in a factual inquiry, taking into account "the character of the governmental action, its economic impact, and its interference with reasonable investment-backed expectations." Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1005, 104 S.Ct. 2862, 2874, 81 L.Ed.2d 815 (1984), quoting PruneYard Shopping Center v. Robins, 447 U.S. 74, 83, 100 S.Ct. 2035, 2041, 64 L.Ed.2d 741 (1980). A case might be made that the Preservation Act interferes with Parkridge's investment-backed expectations.[13] Yet, we have already found that, when Parkridge assumed Ridgestone's obligations, it was foreseeable that the government might impair the partnership's contractual options in order to prevent the program's purposes from being foiled. Therefore, we cannot agree that Parkridge's expectation of a continued, unrestricted right to prepay was "reasonable." We conclude that application of the Preservation Act to Parkridge does not work a compensable taking.
 
 
 20
 Even if we did find a compensable taking, however, Parkridge's claim would still suffer from two conspicuous faults. First, takings are unconstitutional only if they are unaccompanied by just compensation. Thus, at most Parkridge would be entitled to the fair market value of its property; yet, fair market value is exactly what the partnership would receive as a result of a statutorily compelled sale to a non-profit. Parkridge responds that if it sold the project for "fair market value," as required under the Preservation Act, it would not receive the value of the property for its highest and best use, but rather its value in a "closed market," limited to use as low-income housing. Yet Parkridge has called nothing to the attention of the Court indicating that such a narrow valuation methodology would apply.[14] The statute simply provides that fair market value shall be determined:
 
 
 21
 by 2 independent appraisers, one of whom shall be selected by [FmHA] and one of whom shall be selected by the borrower. If the 2 appraisers fail to agree on the fair market value, [FmHA] and the borrower shall jointly select a third appraiser, whose appraisal shall be binding on [FmHA] and the borrower.
 
 
 22
 42 U.S.C. Sec. 1472(c)(5)(A)(i).[15] Moreover, it is conceivable that no qualified buyer will be willing to make a bid at the fair market price. If this happens, FmHA can allow Parkridge to prepay--precisely the outcome the partnership seeks in this lawsuit. Therefore, except perhaps for the loss caused by the delay in disposing of the apartments, Parkridge's damages are entirely speculative. Even if the Act represents a taking, it may turn out to be justly compensated, and therefore constitutional. Cf. Thetford Properties, 907 F.2d at 448 (holding that suit challenging provisions of Preservation Act conditioning right to prepay HUD-insured mortgages is barred by plaintiff's failure to exhaust administrative remedies).[16]
 
 
 23
 Finally, even if damages were certain, Parkridge has sought the wrong remedy. In effect, the partnership seeks specific performance of its prerogative to exercise the loan-agreement option to prepay. However, "[e]quitable relief is not available to enjoin an alleged taking of private property for a public use, duly authorized by law, when a suit for compensation can be brought against the sovereign subsequent to the taking." Monsanto, supra, 467 U.S. at 1016, 104 S.Ct. at 2880 (footnote omitted). Further, the Fifth Amendment does not require that compensation precede the taking. Ibid. "Generally, an individual claiming that the United States has taken his property can seek just compensation under the Tucker Act, 28 U.S.C. Sec. 1491." Ibid. Thus, even if Parkridge suffered a taking resulting in a loss, it has failed to demonstrate why a post-taking damages action would not suffice.
 
 V.
 
 24
 To summarize: the government may have acted unfairly in sharply curtailing, if not eliminating altogether, Parkridge's right to prepay. Clearly the Preservation Act is inconsistent with the terms of the loan agreements. However, we reject both due-process and takings challenges to this legislation. Parkridge was aware of the clear objectives of the program, and thus the risk of statutory change. The government, for its part, did not unmistakably waive its right to make such changes. Furthermore, we conclude no taking has occurred; even if one had, Parkridge has fallen far short of demonstrating that it will receive constitutionally insufficient compensation for its property under the Preservation Act scheme.
 
 
 25
 For the foregoing reasons, we decline to hold the Emergency Low Income Housing Preservation Act and supporting regulations unconstitutional as applied to the circumstances of this case. Therefore, the judgment of the District Court is affirmed.
 
 
 
 [1]
 The Honorable Richard H. Battey, United States District Judge for the District of South Dakota
 
 
 [2]
 For simplicity's sake, the mortgages, promissory notes, assumption agreements, and other documents from both 1974 and 1985 will be referred to collectively as the "loan agreements."
 
 
 [3]
 There are two exceptions to the sale requirement, but both come into play only after FmHA has sought to negotiate an agreement which will extend the life of the project, and both are rather restrictive. 42 U.S.C. Sec. 1472(c)(5)(G); Lifgren, 767 F.Supp. at 1478-79
 
 
 [4]
 The Preservation Act contains additional limitations on the right to pre-pay. First, prepayment is prohibited in the absence of available funds for helping non-profits finance purchases. 42 U.S.C. Sec. 1472(c)(5)(A)(ii). Second, no more than 5,000 units may be transferred each fiscal year, excluding those pre-paid under the Sec. 1472(c)(5)(G) exceptions. 42 U.S.C. Sec. 1472(c)(5)(F). However, both of these constraints are waived if 15 months have passed without any budget authority to finance transfers. Ibid
 
 
 [5]
 Because neither party has suggested that the loans in this case are subject to "restrictive-use clauses," which would mandate a specific period of operation as low-income housing, we apply Exhibit E of the regulations. See 7 C.F.R. Sec. 1965.90(b)(1)-(2)
 
 
 [6]
 The process by which fair market value is determined is discussed in detail below
 
 
 [7]
 Indeed, the legislative history implies that the drafters envisioned that all pre-paid units would be sold to non-profits and government agencies, with help from the federal government. H.R.Rep. No. 122(I), 100th Cong., 1st Sess. 54-55, reprinted in 1987 U.S.Code Cong. & Admin.News 3317, 3370-71
 
 
 [8]
 Parkridge does not raise, nor do we address, any claim that the Preservation Act is unconstitutional because it is the kind of law which, if enacted by a state, would violate the Contracts Clause of the Constitution. Art. I, Sec. 10
 
 
 [9]
 See also Cohen and Mattis, Prepayment Rights: Abrogation By the Low-Income Housing Preservation and Resident Homeownership Act of 1990, 28 Real Property, Probate and Trust Journal of the ABA 1, 36 (1993) (analyzing Housing and Urban Development-related amendments to the Preservation Act)
 
 
 [10]
 Such a waiver might require explicit statutory authority, but we need not decide that question here
 
 
 [11]
 For instance, the terms of Parkridge's "Amended Loan Agreement" included a "regulatory covenant" not to use the housing "for any purpose other than as rental housing and related facilities for eligible occupants," without prior consent of the government. Jt.App. 68, p 6(e)(1)
 
 
 [12]
 Cf. Cohen and Mattis, supra note 9, suggesting that limitations on prepayment rights violate the Contracts Clause, as "incorporated" by the Fifth Amendment, but not substantive due process. 28 Real Property, Probate and Trust Journal of the ABA at 42, 44
 
 
 [13]
 Cohen and Mattis, supra note 9, at 31
 
 
 [14]
 Even if a closed market were used, there might be no constitutional problem, given that Congress financed the property to serve a specific public purpose
 
 
 [15]
 FmHA's regulations do state that appraisals will be conducted in accordance with FmHA Instruction 1922-B, "available in any FmHA Office." 7 C.F.R. Sec. 1965, Exh. E(VI)(A). Neither side has favored us with a copy of this directive
 
 
 [16]
 "[U]nder certain circumstances, HUD has the authority to grant [the borrowers] the ultimate economic relief that they seek--prepayment and withdrawal from the program.... Further, if they choose to remain in the program, the statute also allows HUD to offer appellants economic incentives to give them a 'fair return' on their investment.... Thus, requiring exhaustion here may very well lead to a satisfactory resolution of this controversy without having to reach appellants' constitutional challenge." Ibid. (citations omitted)